Justice LaVECCHIA
delivered the opinion of the Court.
Our Mount Laurel decisions recognized a constitutional obligation that municipalities, in the exercise of their delegated power to zone, “afford[] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing.” S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 92 N.J. 158, 205, 456 A.2d 390 (1983) [hereinafter Mount Laurel II] (citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel, 67 N.J. 151, 174, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) [hereinafter Mount Laurel I ]). Mount Laurel I was followed by years of political inertia, failing to address the constitutional deprivation affecting the least fortunate in our society. We preferred a legislative solution. However, in the absence of a legislative response to the constitutional imperative set forth in Mount Laurel I, we were compelled in Mount Laurel II to fashion a remedy that was necessary to meet the urgency of the problem. It was designed to curb exclusionary zoning practices and to foster development of affordable housing for low- and moderate-income individuals. It also was an extraordinarily detailed remedy.
Thereafter, the Legislature enacted the Fair Housing Act (FHA), L. 1985, c. 222. See N.J.S.A. 52:27D-302; Hills Dev. Co. v. Twp. of Bernards, 103 N.J. 1, 19, 510 A.2d 621 (1986). The FHA codified the core constitutional holding undergirding the Mount Laurel obligation, see In re Petition for Substantive Certification Filed by Twp. of Warren, 132 N.J. 1, 12, 622 A.2d 1257 (1993) (citing to Mount Laurel obligation found in N.J.S.A 52:27D-302(a), (d), (e), -311(a), -314(a), (b)), and included particularized means by which municipalities could satisfy their obligation, mirroring the judicially crafted remedy. Further, the FHA created the Council on Affordable Housing (COAH), *585 N.J.S.A. 52:27D-305, and provided it with rulemaking and adjudicatory powers to execute the provision of affordable housing. Hills, supra, 103 N.J. at 19-20, 510 A.2d 621.
In this matter, we review the Appellate Division’s invalidation of the most recent iteration of COAH regulations applicable to the third round of municipal affordable housing obligations (Third Round Rules). In the Third Round Rules, COAH proposed a new approach—a “growth share” methodology—for assessing prospective need in the allocation of a municipality’s fair share of the region’s need for affordable housing. In invalidating the Third Round Rules, the Appellate Division expressed doubt about whether any growth share methodology adopted by COAH could be compatible with the Mount Laurel II remedy that “appears to militate against the use of’ a growth share approach for determining a municipality’s affordable housing obligation. In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J.Super. 462, 485, 6 A.3d 445 (App.Div.2010). That overarching question looms over all other issues in this challenge to the Third Round Rules.
Having had three decades of experience with the current affordable housing remedy, we cannot say that there may not be other remedies that may be successful at producing significant numbers of low- and moderate-income housing—remedies that are consistent with statewide planning principles, present space availability, and economic conditions. New Jersey in 2013, quite simply, is not the same New Jersey that it was in 1983. Changed circumstances may merit reassessing how to approach the provision of affordable housing in this state. Assumptions used in devising a remedy in 1983 do not necessarily have the same validity today. That assessment, however, is best made by the policymakers of the Legislature who can evaluate the social science and public policy data presented to this Court. Indeed, at oral argument, the many parties to this litigation were questioned as to whether their arguments were better suited for legislative hearings on the subject.
That said, our response to the overarching question previously identified is that the constitutional obligation and the judicial *586 remedy ordered by this Court in Mount Laurel II, and in place today through the FHA, are distinct and severable. The exceptional circumstances leading this Court to create a judicial remedy thirty years ago, which required a specific approach to the identification and fulfillment of present and prospective need for affordable housing in accordance with housing regions in our state, should not foreclose efforts to assess whether alternative approaches are better suited to modern planning, development, and economic conditions in the Garden State. The policymaking branches may arrive at another approach to fulfill the constitutional obligation to promote ample affordable housing to address the needs of the people of this state and, at the same time, deter exclusionary zoning practices. We hold that our remedy, imposed thirty years ago, should not now be viewed as a constitutional straightjacket to legislative innovation.
However, unless the Legislature amends the FHA, which tracks the judicial remedy in its operative provisions, the present regulations premised on a growth share methodology cannot be sustained. The changes in the Third Round Rules are beyond the purview of the rulemaking authority delegated to COAH because they conflict with the FHA, rendering the regulations ultra vires.
Moreover, due to COAH’s failure to enact lawful regulations to govern municipalities’ ongoing obligations to create affordable housing under the FHA, we have no choice but to endorse the remedy imposed by the Appellate Division in order to fill the void created by COAH. COAH shall adopt regulations, as directed by the Appellate Division, without delay. As modified by this opinion, we thus affirm the Appellate Division’s judgment with respect to the invalidity of the Third Round Rules under the FHA as expressed in the Honorable Stephen Skillman’s comprehensive opinion.
I.
The following summary of the Mount Laurel doctrine outlines the key points in its development through a series of cases, the FHA’s enactment, and prior regulations.
*587 A.
In Mount Laurel I, supra, this Court held that a developing municipality could not utilize its zoning power to eliminate the realistic possibility of construction of affordable low- and moderate-income housing without acting in a manner contrary to the state’s general welfare. 67 N.J. at 174, 336 A.2d 713. We explained that zoning decisions involve the exercise of police powers and have a “substantial external impact” on neighboring areas. Id. at 177, 336 A.2d 713. Thus, we reasoned that the adoption of zoning ordinances having an exclusionary effect required, under our State Constitution, a developing municipality to consider and serve the interests of citizens beyond its borders. Id. at 174-75, 177, 336 A.2d 713. Consequently, Mount Laurel I prohibited the discriminatory use of zoning powers and mandated that developing municipalities like Mount Laurel affirmatively act to make housing available to their fair share of the region’s present and prospective need for low- and moderate-income housing. Id. at 187-88, 336 A.2d 713.
Despite the constitutional “general welfare” pronouncement in Mount Laurel I, the holding’s impact was stunted by the absence of critical definitions, such as a “municipality’s fair share” and the “present and prospective regional need.” See, e.g., Oakwood at Madison, Inc. v. Twp. of Madison, 72 N.J. 481, 499, 371 A.2d 1192 (1977) (declining to define ambiguous term “fair share”). Its impact also was limited by its restriction to developing municipalities, rather than all communities. See, e.g., Pascack Ass’n v. Mayor & Council of Washington, 74 N.J. 470, 483-84, 379 A.2d 6 (1977) (finding Mount Laurel doctrine only applied to developing municipalities when considering challenge to zoning ordinance in “fully developed, predominantly single-family residential community”). Moreover, municipalities continued to resist applying zoning ordinances in non-exclusionary manners and failed to provide for the creation of affordable housing.
In response, our 1983 decision in Mount Laurel II, supra, strengthened the Mount Laurel doctrine. 92 N.J. at 205, 456 *588 A.2d 390. Having already been recognized in Mount Laurel I as constitutionally required to serve human values essential to individuals beyond just those persons living within the geographic borders of a municipality, Mount Laurel II reaffirmed that a municipality’s zoning power could not be utilized in contravention of the general welfare of the state and restated the legal and moral bases for its conclusion. Id. at 208-10, 456 A.2d 390. The holding emphasized that helping people secure a decent home is more than just an ideal. Ibid. It is a fundamental constitutional, and moral, general welfare obligation. Ibid. Municipalities satisfy “that constitutional obligation by affirmatively affording a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing. This is the core of the Mount Laurel doctrine.” Id. at 205, 456 A.2d 390 (internal citation omitted).
Thus, when exercising their power to zone, municipalities across the state—not just developing municipalities—are required to account for the housing needs of individuals residing outside of their municipalities “but within the region that contributes to the housing demand” in their municipalities. Id. at 208, 456 A.2d 390. “That is the constitutional rationale for the Mount Laurel doctrine. The doctrine is a corollary of the constitutional obligation to zone only in furtherance of the general welfare.” Id. at 209, 456 A.2d 390.
Municipalities’ intransigence in creating affordable housing at the time Mount Laurel II was presented to the Court triggered the imposition of the judicial remedy that then was fashioned. Id. at 199-201, 456 A.2d 390. The Court in Mount Laurel II explained that its remedy “provide[d] a method of satisfying that obligation when the zoning in question affects housing.” Id. at 209, 456 A.2d 390. We stated that we would no longer tolerate a “numberless approach” as a remedy and that the “fair share” standard must be quantitative, not qualitative, in order to satisfy the constitutional obligation. Id. at 222, 456 A.2d 390. We proceeded to detail—because of the absence of any legislative *589 solution—assumptions to be used, and those avoided, in crafting a permissible formula for determining a municipality’s “fair share,” id. at 256-57, 456 A.2d 390, and a standard for evaluating a “realistic opportunity,” id. at 260-61, 456 A.2d 390.
Extending the doctrine’s reach to all municipalities, id. at 258-59, 456 A.2d 390, Mount Laurel II added teeth to the doctrine by adopting a judicial remedy. We created a special litigation track for exclusionary zoning cases, id. at 292-93, 456 A.2d 390, enumerated certain affirmative measures that would define the tools at a municipality’s disposal, id. at 260-67, 456 A2d 390, and sanctioned a “builder’s remedy,” which permits builder-plaintiffs to sue for the opportunity to construct housing at higher densities than a municipality otherwise would allow, id. at 279-81, 456 A.2d 390. Despite this Court’s specific enforcement enhancements to the doctrine, we repeated a preference for legislative solutions in the affordable housing arena. Id. at 352, 456 A.2d 390. In 1985, the New Jersey Legislature heeded that call by enacting the FHA. L. 1985, c. 222; see N.J.S.A 52:27D-302.
B.
The FHA created COAH and vested it with primary responsibility for assigning and determining municipal affordable housing obligations. N.J.S.A. 52:27D-305. The FHA charged COAH “with, among other things, determining State housing regions, estimating the State and regional present and prospective need for low and moderate income housing, and adopting criteria and guidelines for a [mjunicipal determination of its present and prospective fair share of [the region’s] housing need.” Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 544, 803 A.2d 53 (2002) (internal citations and quotation marks omitted); Hills, supra, 103 N.J. at 19-20, 510 A2d 621. The FHA also contained a safe haven for municipalities that bear their fair share of their region’s low- and moderate-income housing need: they can seek substantive certification from COAH, N.J.S.A. 52:27D-313, which, if granted, insulates that municipality from exclusionary zoning liti *590 gation for ten years (six years as originally passed), N.J.S.A. 52:27D-313(a). The FHA transferred all pending and future Mount Laurel litigation to COAH for resolution in the first instance through the agency’s administrative processes. Hills, supra, 103 N.J. at 20, 510 A.2d 621.
This Court upheld the FHA against a constitutional challenge, determining the statute was a valid method of creating a realistic opportunity to satisfy the state’s affordable housing need. Id. at 25, 41-42, 510 A.2d 621; see also id. at 43, 510 A.2d 621 (reviewing Court’s requests to Legislature to act when explaining, in part, reasoning for strong deference to Legislature).
C.
COAH adopted rules delineating the affordable housing obligations of municipalities for the periods of 1987 to 1993—the First Round Rules—and 1993 to 1999—the Second Round Rules. See N.J.A.C. 5:92-1.1 to -18.20, Appendices A to F; N.J.A.C. 5:93-1.1 to -15.1, Appendices A to H. COAH subsequently readopted the Second Round Rules and established May 2004 as the new expiration date for that period of obligations.
In general, the First and Second Round Rules utilized a methodology for calculating affordable housing obligations that was consistent with the mechanisms developed by trial courts prior to the FHA’s enactment. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 473, 6 A.3d 445; see, e.g., AMG Realty Co. v. Twp. of Warren, 207 N.J.Super. 388, 504 A.2d 692 (Law Div.1984) (developing methodologies for determining affordable housing obligations). The First Round Rules specified methods for determining present need, including indigenous need and reallocated present need, and prospective need. See N.J.AC. 5:92, Appendix A Present need was defined as “the total number of deficient housing units occupied by low or moderate income households as of July 1, 1987.” N.J AC. 5:92-1.3. To establish present need, COAH used several factors, including “overcrowding, age of unit, and lack of plumbing, kitchen or heating facilities as indicators of dilapidated *591 housing.” In re Adoption of N.J.A.C. 5:9k & 5:95, 390 N.J.Super. 1, 23, 914 A.2d 348 (App.Div.), certif. denied, 192 N.J. 71, 71-72, 926 A.2d 856 (2007). “[Ejxeess present need in urban aid municipalities was reallocated to all municipalities within the regional growth area.” Ibid.; see N.J.A.C. 5:92, Appendix A (designating regional growth areas).
In contrast, prospective need was “a projection of low and moderate housing needs based on development and growth ... reasonably likely to occur in a region or a municipality.” N.J.A.C. 5:92-1.3. COAH used statistical analysis to project the number of “low- and moderate-income households” that would form between 1987 and 1993. N.J.AC. 5:92, Appendix A at 92-49. In determining prospective need, COAH considered municipalities’ “approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission.” N.J.A.C. 5:92-1.3.
The First Round Rules determined a municipality’s allocated need “based on employment within the municipality, projected employment within the municipality, the percentage of the municipality in a growth area, and the municipality’s wealth,” which was similar to the calculations developed in AMG Realty, supra, 207 N.J.Super. at 398-410, 504 A.2d 692. In re N.J.A.C. 5:9k, supra, 390 N.J.Super. at 23-24, 914 A.2d 348 (citing N.J.A.C. 5:92, Appendix A at 92-49 to -50). Unlike AMG Realty, however, COAH’s methodology considered “secondary sources of housing supply and demand in calculating both statewide and regional need.” In re N.J.A.C. 5:9k, supra, 390 N.J.Super. at 24, 914 A.2d 348. COAH’s First Round Rules also identified market forces that have the effect of reducing overall housing need. Ibid,, (citing N.J AC. 5:92, Appendix A at 92-52 to -54 (addressing filtering, residential conversions, and spontaneous rehabilitation)).[1]
*592 The Second Round Rules maintained the methodologies adopted in the First Round Rules. N.J.A.C. 5:93, Appendix A. COAH also adopted regulations that granted credits and adjustments to municipalities to reduce their fair share figures. See N.J.A.C. 5:93-2.15, -3.2 (credits for affordable housing constructed between 1980 and 1986); N.J.AC. 5:93-3.6 (credits for substantial compliance); N.J.AC. 5:93-5.15 (credits for rental housing); N.J.A.C. 5:93-4.2, -4.3 (adjustments for municipalities lacking sufficient vacant land or access to water and sewerage). Additionally, the Second Round Rules permitted municipalities “to satisfy up to twenty-five percent of their fair share through age-restricted affordable housing.” In re N.J.A.C. 5:94, supra, 390 N.J.Super. at 25, 914 A.2d 348 (citing N.J.A.C. 5:93-5.14).
Various legal challenges to COAH’s First and Second Round Rules failed. See, e.g., Twp. of Bernards v. Dep’t of Cmty. Affairs, 233 N.J.Super. 1, 12-22, 558 A.2d 1 (App.Div.), certif. denied, 118 N.J. 194, 570 A.2d 959 (1989) (rejecting numerous challenges to First Round Rules, including allegation that COAH acted arbitrarily in considering municipality’s wealth as allocation factor); Van Dalen v. Washington Twp., 120 N.J. 234, 246-47, 576 A.2d 819 (1990) (upholding COAH’s reliance on planning designations in State Development Guide Plan); In re Petition for Substantive Certification Filed by Twp. of Warren, 247 N.J.Super. 146, 179-83, 588 A.2d 1227 (App.Div.1991) (rejecting challenge that First and Second Round Rules violated Mount Laurel doctrine because they did not require housing for most impoverished citizens), rev’d in part on other grounds, 132 N.J. 1, 622 A.2d 1257 (1993) (invalidating occupancy preference regulation allowing municipalities to set aside fifty percent of fail’ share housing for low- and moderate-income persons who lived or worked in town).
*593 In sum, until adoption of the Third Round Rules, the methodologies used by COAH largely followed the remedial approaches established in Mount Laurel II and AMG Realty. For two decades following Mount Laurel II, the process of allocating municipal affordable housing obligations proceeded in steps. COAH first would calculate the need for affordable housing in each of the state’s regions and then would allocate to each municipality its fair share of the present and prospective regional need. A municipality’s fair share obligation was fixed as a specific number of affordable housing units. Each municipality was assigned a proportionate fair share of the region’s need for housing based on its economic projections and its capacity to accommodate affordable housing. A municipality that failed to create a realistic opportunity for satisfying its assigned fair share would leave itself vulnerable to a builder’s remedy challenge, wherein a builder-plaintiff could bring suit to override a municipality’s zoning autonomy and construct affordable housing.
D.
The Third Round Rules initially were promulgated in December 2004.[2] The rule proposal published in the New Jersey Register explained that a municipality’s fair share for the period from 1987 through January 1, 2014, would be calculated using three criteria:
(1) a municipality’s “rehabilitation share” based on the condition of housing revealed in the data gathered for the 2000 Census, previously known as a municipality’s indigenous need; (2) a municipality’s unsatisfied prior round obligation (1987 through 1999), satisfaction of which will be governed by the second round rules; and (3) a municipality’s “growth share” based on housing need generated by statewide job growth and residential growth from 1999 through 2014.
*594 [In re N.J.AC. 5:91, supra, 390 N.J.Super, at 27, 914 A.2d 348.]
See also 36 N.J.R. 5748, 5750 (Dee. 20, 2004). The third criterion was a substantial methodological departure from that used in the prior rounds. The growth share approach—that is, tying a municipality’s affordable housing obligation to its own actual rate of growth—became the new and central criterion for determining a municipality’s future fair share obligation.
Before exploring the nature of this approach, we detail the procedural steps that preceded this Court’s consideration of the current challenge to COAH’s adoption of a growth share methodological approach.
E.
In a challenge to the initial iteration of the Third Round Rules, the Appellate Division, in a decision authored by the Honorable Mary Catherine Cuff, sustained some but rejected many of the specific challenges to the regulations. In re N.J.A.C. 5:94, supra, 390 N.J.Super. at 1, 914 A.2d 348. As summarized by the appellate panel that considered the present appeal:
Judge Cuffs opinion rejected appellants’ arguments that the “rehabilitation share” of a municipality’s affordable housing obligation, sometimes also referred to as present need, should include “cost burdened” low- and moderate-income households that reside in standard housing and households that lack permanent housing or live in overcrowded housing; that COAH’s methodology for identifying substandard housing was “arbitrary and unreasonable”; that the third round rules improperly eliminated the part of the first and second round methodologies that required reallocation of excess present need in poor urban municipalities to other municipalities in the region; that the use of regional contribution agreements to satisfy part of a municipality’s affordable housing obligations violates the Mount Laurel doctrine and federal and state statutory provisions; that the allowance of bonus credits towards satisfaction of a municipality’s affordable housing obligations unconstitutionally dilutes those obligations; and that the rule relating to vacant land adjustments violates the Mount Laurel doctrine and the FHA.
However, Judge Cuffs opinion invalidated the parts of the original third round rales that reduced statewide and regional affordable housing need based on “filtering”; adopted a growth share approach for determining a municipality’s fail-share of prospective needs for affordable housing and excluded job growth resulting from rehabilitation and redevelopment in determining job growth; compelled developers to construct affordable housing without any compensating benefits; authorized a municipality to give a developer the option of payment of a fee in lieu *595 of constructing affordable housing, but provided no standards for setting those fees; and authorized a municipality to restrict up to 50% of newly constructed affordable housing to households with residents aged fifty-five or over.
[In re N.J.A.C. 5:96, supra. 416 N.J.Super. at 475-76, 6 A.3d 445 (citations omitted).]
Because the Appellate Division invalidated a substantial number of the nascent Third Round Rules, the matter was remanded to COAH for the adoption of revised Third Round Rules. In re N.J.A.C. 5:9b, supra, 390 N.J.Super. at 86-88, 914 A.2d 348. COAH was twice granted extensions from its original six-month deadline and, finally, proposed revised Third Round Rules in January 2008, adopting those revised rules on June 2, 2008, without significant alteration. After a number of notices of appeal were filed, COAH proposed and subsequently adopted, on October 20, 2008, a number of amendments to the revised Third Round Rules. See N.J.A.C. 5:96-1.1 to -20.4; N.J.A.C. 5:97-1.1 to -10.5, Appendices A to F. The instant appeals followed from the adopted Third Round Rules.
F.
1.
In the judgment under review, the Appellate Division invalidated a substantial portion of the new regulations, including the growth share methodology used by COAH, and ultimately remanded for the promulgation of a new set of rules within five months. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 511-12, 6 A.3d 445. Although several of the parties have raised new arguments before this Court, the Appellate Division’s holdings concerning the various regulations in the Third Round Rules comprise the bulk of the issues on appeal.
The panel initially addressed the validity of the newly adopted growth share model, particularly as a component of computing a municipality’s affordable housing obligation. See N.J.A.C. 5:97-2.2, -2.4, -2.5. Under the new model, a municipality’s obligation is the sum of (1) the rehabilitation share, (2) the prior round *596 obligation, and (3) the growth share. Ibid. The panel concluded that the growth share component is inconsistent with the Mount Laurel doctrine and expressed doubts as to whether any growth share model could survive scrutiny because a municipality’s obligation should not hinge on its choice of whether or not to grow. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 483-85, 6 A.3d 445. For this reason, the panel struck down as inconsistent with Mount Laurel II the growth share methodology in the Third Round Rules. Id. at 485, 6 A.3d 445.
The panel next invalidated several other important provisions in the Third Round Rules. First, the panel struck down the regulations concerning the preparation of fair share plans. Id. at 487-88, 6 A.3d 445; see N.J.A.C. 5:97—3.2(a)(4)(iv). Several parties argued that the fair share plans were overly vague, but the panel, while finding some merit to the vagueness argument, ultimately invalidated the regulation because it was wholly dependent on the growth share methodology. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 487-88, 6 A.3d 445.
Second, the panel struck down the presumptive incentives embodied in the regulations. Id. at 488-93, 6 A.3d 445; see N.J. AC. 5:97-6.4. Taking issue with the presumptive minimum densities and maximum set-aside percentages, the panel concluded that the incentives were insufficient to create a “realistic opportunity” for the development of affordable housing. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 493, 6 A.3d 445. The panel viewed the minimum densities as too low and the maximum set-asides as too high to properly incentivize developers. Id. at 491-93, 6 A.3d 445.
Third, the panel invalidated the provisions concerning rental bonus credits, N.J.A.C. 5:97-3.5, and compliance credits, N.J.A.C. 5:97-3.17. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 493-95, 497-98, 6 A.3d 445. The panel took issue with COAH providing credits to municipalities for rental units yet to be constructed more than one decade after the prior round. Id. at 494-95, 6 A.3d 445. And, the panel concluded that compliance credits neither *597 furthered public policy nor assisted municipalities in fulfilling their constitutional obligations. Id. at 497-98, 6 A.3d 445.
On the other hand, the Appellate Division upheld several of the regulations against party challenges. The panel concluded that it was not constitutionally prohibited to do away with reallocated present need. Id. at 500-02, 6 A.3d 445. Instead, the panel reasoned that COAH possessed the authority to focus on a municipality’s own obligation, see N.J.A.C. 5:97-2.4, rather than reallocating excess present need away from those areas overburdened with substandard housing. In re N.J.AC. 5:96, supra, 416 N.J.Super. at 501-02, 6 A.3d 445. The panel similarly dismissed a challenge that municipalities were being forced to make direct expenditures to satisfy their affordable housing obligations in contravention of N.J.S.A. 52:27D-302(h), -311(d). In re N.J.AC. 5:96, supra, 416 N.J.Super. at 502-05, 6 A.3d 445. The panel concluded that incidental impacts on municipal finances do not constitute mandated expenditures and, in any event, municipalities could petition COAH for an adjustment of their obligations. Id. at 504-05, 6 A.3d 445. Finally, the panel upheld COAH’s decision to use the prior round obligations without updating the obligations based on actual household growth. Id. at 498-500, 6 A.3d 445; see N.J.A.C. 5:97, Appendix C at 97-71.
2.
As its remedy, the panel directed COAH to use methodologies consistent with the first two rounds. In re N.J.A.C. 5:96, supra, 416 N.J.Super. at 511, 6 A.3d 445. COAH applied for a stay from the Appellate Division, which was denied.
On December 23, 2010, COAH sought leave to apply for a stay from this Court, arguing that it should not be required to expend substantial resources formulating new rules that this Court’s review might render a nullity. While that decision was pending, Fair Share Housing Center (FSHC) moved for the enforcement of litigant’s rights against COAH, arguing that the agency was failing to comply with the Appellate Division’s remand instructions. FSHC noted that COAH had cancelled a number of its *598 board meetings and taken no action to comply with the Appellate Division’s remand instructions. On January 13, 2011, the Appellate Division ordered COAH to comply immediately with its prior decision and to submit biweekly reports to enable the court to monitor COAH’s continuing compliance. The following day, this Court granted COAH’s application for a stay of the Appellate Division opinion. Reconsideration of that decision was denied. Our Court thereafter granted the instant petitions and cross-petitions for certification. 205 N.J. 317, 15 A.3d 325 (2011).
II.
A.
Because growth share is the backbone of the regulatory scheme adopted by COAH, the regulations’ validity rises or falls on whether the growth share approach adopted in the revised Third Round Rules is permissible. That coi’e issue permeates the arguments of the parties, and the amici, in this appeal.
COAH, in its petition seeking reversal of the Appellate Division judgment, urges this Court to look favorably on allowing a new growth share methodology. In addition to its defense of the adequacy of its rulemaking record, COAH argues that the specificity of Mount Laurel II should not preclude a growth share methodology, which is an innovative and valid administrative response to current conditions in the state, notably the dearth of vacant, developable land. That scarcity makes a growth share approach particularly appealing as the methodology promotes redevelopment rather than continued sprawl.
The New Jersey State League of Municipalities (League) contends that binding COAH to the use of a nearly thirty-year-old methodology is a mistake in light of changed circumstances. Although the League finds deficiencies in the formulas utilized by COAH, it nonetheless advocates for a growth share approach as “a viable and appropriate method [for] municipalities to satisfy their constitutional obligation.”
*599 Also before the Court is a petition for certification filed by Clinton Township and ten other municipalities (collectively the Eleven Municipalities).[3] The Eleven Municipalities argue that this Court either should create a simplified growth share model as the sole means of allocating and satisfying affordable housing obligations or, alternatively, affirm that growth share is a permissible methodology and send the matter back to COAH. The Eleven Municipalities assert that the current system of implementing Mount Laurel obligations is unsustainable and urge this Court to consider simply assigning prospective need and obligation at ten percent of a municipality’s future residential growth with certain safety valves. Insofar as the Mount Laurel II decision militates against its ten-percent proposal, the Eleven Municipalities would have this Court reassess that decision. Finally, the Eleven Municipalities find flaws in the formulas and data used by COAH in implementing the Third Round Rules.
Middletown Township argues that this Court should overturn or reassess Mount Laurel II. Additionally, Middletown argues that COAH should provide a safety valve to help overburdened municipalities comply with their large affordable housing obligations.
FSHC petitions this Court to alter the remedy—a remand to COAH—entered by the Appellate Division. At the core of its argument, FSHC maintains that any growth share approach is inconsistent with the Mount Laurel constitutional obligation as implemented by this Court and in the FHA. FSHC urges the Court to “appoint a special master, require bi-monthly reporting by COAH, require the special master to calculate the need numbers according to the Appellate Division’s requirements if COAH does not act, and accelerate any appeals from the regulations that are adopted.” FSHC asks this Court to make clear that if COAH *600 is unable to adopt valid regulations by some date certain, the Court should reassume exclusive responsibility for administering and enforcing the Mount Laurel doctrine.
Finally, several briefs in opposition to certification were filed, which supported the Appellate Division’s rejection of COAH’s new growth share approach. The New Jersey Builders Association, the New Jersey Chapter of the National Association of Industrial and Office Properties, MTAE, Inc., and Kenneth and Alice Martin each contend that the Appellate Division opinion is a direct application of existing precedent and is consistent with this Court’s statements in Mount Laurel II. Further, numerous amici[4] ask this Court to affirm the Appellate Division’s decision and to impose the same remedy: a remand to COAH with direction to use a methodology similar to that used in the prior rounds.
With that lineup of positions, we turn to examine the key concept of growth share.
B.
In 1997, the concept of “growth share” was advocated[5] as an alternative approach to the methodologies used in the First and Second Round Rules. See generally John M. Payne, Remedies for Affordable Housing: From Fair Share to Growth Share, Land *601 Use L. & Zoning Dig., June 1997, at 3, 3. Under a growth share methodology, a municipality’s constitutional obligation “would be a simple ... allocation of] a share of whatever growth actually occurs to low- and moderate-income housing.” Id. at 6 (emphasis in original). According to Professor Payne, growth share needed to capture both residential and nonresidential growth,[6] as well as new development and redevelopment. Ibid. Municipalities would meet their obligations by “requiring] an inclusionary Mount Laurel component in any large-scale developments as they are approved” and by collecting development fees from smaller developments that would be used to subsidize affordable housing elsewhere. Id. at 7 (citing Holmdel Builders Ass’n v. Twp. of Holmdel, 121 N.J. 550, 576, 585, 583 A.2d 277 (1990) (authorizing development fees, explaining that they are “functionaliy] equivalent [to] mandatory set-aside schemes authorized by Mount Laurel II and the FHA”)). Subsidies and regulation of the private market also would supplement those approaches. Id. at 8.
Professor Payne reasoned:
By tracking growth, rather than trying to predict it through an impossibly inaccurate formula, growth share solves many of the problems of the present fair share formula. By definition, it measures the capacity of the private sector to meet part of the need for low- and moderate-income housing, because it is an objective measure of what economic activity actually takes place. Moreover, by allocating fair share obligations after presumptively sound planning decisions have been made by responsible public officials, Mount Laurel compliance would proceed in a much healthier political environment.
[Id. at 7.]
Thus, as proposed, a growth share approach was envisioned as a straightforward allocation method where a municipality would accrue affordable housing obligations as a percentage of the residential and nonresidential growth that occurred within its borders. See id. at 6-7.
*602 When COAH adopted its first iteration of the Third Round Rules in 2004, see generally N.J.AC. 5:94 to 5:95, the agency included the growth share approach as the sole method for calculating a municipality's prospective affordable housing obligation. See N.J AC. 5:94-2.4, -2.5. That set of regulations, however, also continued to hold a municipality responsible for its rehabilitation share and its prior round obligations. N.J.AC. 5:94-1.2.
According to the regulations adopted by COAH, a municipality would accrue an obligation to construct one unit of affordable housing for every eight market-rate units constructed and one unit of affordable housing for every twenty-five jobs created. N.J.A.C. 5:94-2.4. Job growth was calculated by applying a conversion factor to the gross square footage of nonresidential development constructed. N.J.A.C. 5:94, Appendix E at 94-86. The 8:1 and 25:1 growth share ratios were selected by COAH so that affordable housing construction would match adjusted projected need.[7] Ibid.
After the Appellate Division required COAH to adopt new regulations,[8] the agency revised the Third Round Rules. Under the Third Round Rules, municipalities accrue growth share obligations at the rate of one unit of affordable housing for every four new residential units and one unit of affordable housing for every *603 sixteen newly created jobs. N.J.A.C. 5:97-2.2(d), -2.4; N.J.A.C. 5:97, Appendix D. Those ratios were formulated by estimating the state’s projected overall affordable housing need, estimating the projected employment and residential growth in the state, and then calculating how many units of affordable housing per each projected new job and housing unit would be necessary to meet the state’s affordable housing need. See N.J.A.C. 5:97, Appendix A at 97-48.5 to -48.6. As counsel for COAH confirmed at oral argument before this Court, the calculation of affordable housing need did not include region-specific data. Thus, the ratios used in the growth share methodology have homogenized the state’s need for affordable housing and have failed to reflect the specific needs for low- and moderate-incoming housing in different regions of our state.
Specifically, COAH projected a total need of 131,297 units,[9] a figure which was reduced by 15,631 units to account for secondary sources of supply, including filtering, residential conversion, and demolitions. Id. at 97-48.5, -51 to -53. Thus, COAH calculated an adjusted projected statewide need for affordable housing of 115,666 units. Id. at 97-51, -53. COAH utilized data showing housing unit growth would be 314,069[10] and job growth would be 791,465 for the relevant time period. Id. at 97-48.5, -55. After *604 assigning fifty-seven percent of the projected affordable housing need to projected housing unit growth, and forty-three percent of the projected affordable housing need to projected employment growth, COAH determined that the ratios of one affordable housing unit for four market-rate housing units produced and one affordable housing unit for every sixteen jobs created would produce the necessary affordable housing. Id. at 97-48.5, -55.
With those ratios, COAH calculated each municipality’s projected growth share obligation by predicting household and employment growth for each municipality based on the “historical trends for each municipality and the extent to which each municipality approaches its physical growth capacity.” N.J.A.C. 5:97—2.2(d); see also N.J.A.C. 5:97, Appendix F (displaying household and employment projections).
Although COAH initially calculates a municipality’s projected growth share obligation, as the Appellate Division decision by Judge Skillman rightly notes, a municipality only incurs growth share obligations to the extent that growth actually occurs.[11] See N.JAC. 5:97-2.2(e) (“Affordable housing shall be provided in direct proportion to the growth share obligation generated by the actual growth.”); N.JAC. 5:97, Appendix A at 97-56 (“In sum, municipalities incur obligations to provide affordable housing only when and to the extent growth occurs. Each municipality’s current round affordable housing obligation is based on actual growth ____” (emphasis in original)). COAH’s biennial review process ensures that projected growth share obligations are replaced with obligations that are “in proportion to the actual residential growth and employment growth in the municipality.” *605 N.J.A.C. 5:96-10.1(a); see also 40 N.J.R. 5965(a), 5994 (Oct. 20, 2008) (“The projection of growth share is to be used as a planning tool to establish reasonable targets.... The actual obligation will be determined based upon what actually occurs and adjustments will be made during biennial plan reviews.”). Thus, even if a municipality were allocated a large projected growth share obligation, if growth fell below that rate, its actual growth share obligation would be reduced to reflect that slowed residential and job growth.[12] That result is facially inconsistent with the FHA’s command to COAH to develop criteria establishing municipal determinations of present and prospective fair share of housing that results in firm, fair share allocations, see N.J.S.A. 52:27D-307, against which the municipality’s housing element may be designed, N.J.S.A. 52:27D-310, and reviewed for substantive certification purposes, N.J.SA. 52:27D-313, -314. It is also at odds with the remedy adopted in Mount Laurel II, which imposed definitive quantitative obligations to be fulfilled within fixed periods.
C.
1.
With respect to the Mount Laurel II remedy, we felt obliged in view of the municipal inertia toward allowing affordable housing, through exclusionary zoning practices, to compel the building of units in anticipation of projected regional need as well as present need. Mount Laurel II, supra, 92 N.J. at 243-44, 456 A.2d 390. We conceived of the prospective regional need for affordable housing as an ascertainable figure to be calculated prior to determining specific municipal obligations. Id. at 248, 456 A.2d 390. The growth share approach in COAH’s Third Round Rules is not premised on region-specific housing data evidencing the region’s need. See supra at 602-04, 74 A.3d at 906-08. Nor is growth *606 share as presently adopted structured to establish a firm obligation in respect of prospective affordable housing need. See supra at 603-05, 74 A.3d at 907-08. In those respects, the methodology is inconsistent with the remedy that we crafted in Mount Laurel II, but our analysis cannot, and does not, end there.
2.
As argued in this matter, the present approach has been criticized as having produced a labyrinth of administrative processes, which has led to stagnation in defining municipal obligations, as having failed to reduce litigation, and as having promoted turmoil instead of certainty in planning. Further, parties contend that it has led to unwarranted hostility toward inclusionary zoning.
More than thirty years have passed since this Court outlined a framework through which municipalities could satisfy their obligation to provide a fair share of the regional prospective need for affordable housing in Mount Laurel II. We now have decades of data on the creation of affordable housing in New Jersey. The present approach has had demonstrable success at producing affordable housing. Although estimates vary depending on the source, approximately 36,000 to 60,000 new low- and moderate-income units have been developed between 1985 and 2010. Compare David N. Kinsey, Smart Growth, Housing Needs, and the Future of the Mount Laurel Doctrine, in Mount Laurel II at 25: The Unfinished Agenda of Fair Share Housing 57 (Timothy N. Castaño & Dale Sattin eds., 2008) [hereinafter The Unfinished Agenda ] (relying on COAH records), with N.J. Housing Opportunity Task Force, Findings & Recommendations 2 (2010) [hereinafter Taskforce Findings & Recommendations ]. Additionally, approximately 15,000 substandard units have been refurbished, and $210 million has been generated “from suburban sources to apply to urban housing.” Preface, The Unfinished Agenda, supra, at 1.
*607 We also have data on general trends in population size and the production of housing units. The statewide population and number of housing units have steadily increased from the 1980s. According to the United States Census Bureau’s 2010 Census, the New Jersey population increased from 7.37 million to 8.79 million over the last thirty years—a nineteen percent increase from 1980 to 2010. See U.S. Census Bureau, New Jersey: 2010, Population and Housing Unit Counts at Table 4 (Aug. 2012), available at http://www.census.gov/prod/cen2010/cph-2-32.pdf. And, the number of housing units increased from 2.77 million to 3.55 million—a twenty-eight percent increase in the same time period. See ibid. These data reveal that housing has been developed at a quicker pace than population growth in New Jersey.
Moreover, experts in the field have analyzed housing development trends in urban and rural areas. In 1992, the State Planning Commission introduced the State Development and Redevelopment Plan (State Plan), which “prescribed patterns of development and conservation ... with precise mapping.” See Kinsey, Smart Growth, in Ths Unfinished Agenda,, supra,, at 48. The State Plan categorized different types of planning areas: “metropolitan, suburban, fringe, rural, and environmentally sensitive planning areas, [each] with different delineation criteria and policies.” Ibid. Despite the different planning categories and the implementation of affordable housing regulations, “about 40 percent of new growth [between 1995 and 2002] took place in the State Plan’s rural and environmentally sensitive planning areas, rather than being channeled into growth areas and centers.” Id. at 49.[13]
*608 Transportation patterns also have changed significantly since the 1980s. In 1980, the average daily commute was approximately twenty minutes, while today the average commute has grown to thirty-two minutes, indicating New Jerseyans’ willingness to travel farther from home for work. See Taskforce Findings & Recommendations, supra, at 3. Finally, a number of significant road projects have been completed since the 1970s: Interstate 280, Interstate 195, and Interstate 287. Id. at 5.
Moreover, external economic factors have influenced the development of housing in New Jersey. The economic collapse of 2008 has had a significant impact on home prices, with home prices in New Jersey falling by “10 to 20 percent, sometimes even 25” percent in 2009. Antoinette Martin, A Market Going Downhill Fast, N.Y. Times, Feb. 22, 2009, at NJ1.
When we issued our decision in Mount Laurel II, we could not have predicted the precise economic and social changes of the last three decades.
3.
Knowing now the changes wrought over the past three decades, we are compelled to acknowledge that there may well be other effective remedies that would promote inclusionary zoning at the local level, consistent with business and residential objectives, as well as statewide sound-planning objectives, which take into account industrial development, transportation and infrastructure availability, and environmental considerations. Certainly, the methodology of the prior rounds is a proven method of creating a substantial amount of affordable housing, and growth share is an untested approach that assumes municipalities will not utilize their discretion to undercut the production of affordable housing. That is not to say that another approach could not do as well or better. We do not know. A growth share approach, for example, might prove to be successful in addressing prospective need, and it might bring greater transparency to the process and engender a more favorable climate for the creation of affordable housing. Those positives ai’e not to be undervalued.
*609 Although the judicial remedy of Mount Laurel II, as adopted in the FHA, addressed the circumstances of the times, it is not necessarily the only remedy possible for achieving satisfaction of a municipality’s constitutional obligations for prospective need. We do not view our pronouncement—that the remedy set forth by this Court and embraced in the FHA was constitutionally acceptable— as enshrining that particular approach as the be-all-and-end-all of remedies for the future. See, e.g., Mount Laurel II, supra, 92 N.J. at 352, 456 A.2d 390 (explaining that when legislative action is taken, “we have always preferred legislative to judicial action in this field”). Despite the decisional focus at that time on assessing a definite allotment of prospective regional need that must be produced within a specific time, we did not know then how that would practically unfold. Having lived with the present methodology for decades now, the record suggests that there might be reasonable bases for considering alternative approaches to promote the production of affordable housing consistent with present statewide-planning and other principles previously identified.
And, just as words matter, numbers matter too. Applying a growth share approach, for example, might have produced over the past thirty years roughly the same number of affordable housing units that the present allocation method has produced.[14] *610 Although a growth share approach might not have produced units in the same regions or municipalities where they occurred, we cannot say that it is anathema to consider some form of such an approach adjusted for present-day building realities.
To be sure, deterring exclusionary municipal zoning practices and concomitantly encouraging development of affordable housing in housing regions where it is needed were the goals of the obligation recognized under the General Welfare Clause of the New Jersey Constitution. See Mount Laurel II, supra, 92 N.J. at 352, 456 A.2d 390 (concluding that constitutional obligation requires municipalities “to provide a realistic opportunity for housing” for low- and moderate-income persons in our state). How to respond to the constitutional obligation imposed on municipalities in the exercise of their delegated power to zone is a separate question, and one that might be adequately addressed in different ways tailored to today’s circumstances. See supra at 586-89, 74 A.3d at 897-99. We therefore recognize, and hold, that the constitutional obligation identified in Mount Laurel I and refined and made applicable to all municipalities in Mount Laurel II is distinct from the judicial remedy that this Court embraced.
Development merely for development’s sake is not the constitutional goal. Mount Laurel II, supra, 92 N.J. at 238, 456 A.2d 390 (“The Constitution of the State of New Jersey does not require bad planning. It does not require suburban spread. It does not require rural municipalities to encourage large scale housing developments.”); id. at 211, 456 A.2d 390 (“But if sound planning of an area allows the rich and middle class to live there, it must also realistically and practically allow the poor. And if the area will accommodate factories, it must also find space for workers. The specific location of such housing will of course continue to depend on sound municipal land use planning.”). Nor are all aspects to the remedy fashioned in Mount Laurel II indispensable components of a remedy for the future. One can envision alternative approaches that, perhaps, might relegate a builder’s remedy to a more reserved status among available *611 solutions to encouragement of construction of affordable housing, reducing the political turmoil that has plagued voluntary compliance with the constitutional goal of advancing the delivery of affordable housing. See Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6.
Other aspects to the judicial remedy might benefit from reexamination. For example, our remedy’s utilization of a pre-fixed allocation of municipal obligations based on forecasted projected growth has been criticized for the crudeness inherent whenever one presumes to anticipate development cycles. Id. at 6-7. We do not pretend to know what form or forms of alternative remedies might be devised that would suitably further the constitutional goal of addressing the prospective need for affordable housing. But, that should not prevent policymakers from considering the benefits of an alternate remedy that accounts for current economic conditions, the building that has occurred already in this state, the present-day space availability and redevelopment options, and the wisdom of requiring building in all municipalities of the state within fixed periods. Those are questions for policymakers— should our Legislature choose to address the topic.
Certainly, tools must remain in place to deal with those municipalities that would affirmatively choose not to grow—either commercially or residentially—in order to avoid having any inclusionary zoning obligation. Mandated requirements for the production of definite numbers of affordable housing units may prove to be the only way to address those municipalities that heretofore have avoided their affordable housing obligations.[15] But, the record *612 before this Court did not include evidence or data that such municipal action would take place, and we are wont to agree with those that assert that circumstances of such utter recalcitrance are not common at present. Nor do we believe that we should presume the worst and deal with that worst-case scenario as if all municipalities would act similarly. To be sure, our courts will enforce the constitutional obligation if evidence is presented to us of municipalities zoning in exclusion of the general welfare of the citizens of our state. See N.J. Const, art. 1,111.
In sum, the judicial remedy that was fashioned based on a record created thirty years ago should not be viewed as the only one that presently can secure satisfaction of the constitutional obligation to curb exclusionary zoning and promote the development of affordable housing in the housing regions of this state. Assuming that ordered development will continue to be used as a tool in the delivery of affordable housing, the Legislature should determine how best to utilize that means in the promotion of affordable housing suited for the needs of housing regions.
D.
In light of our clarification that the judicial remedy imposed in Mount Laurel II is not a straightjaeket to legislative innovation for satisfaction of the constitutional obligation, the Third Round Rules’ validity hinges on whether they are consistent with the FHA.
The FHA sets forth the framework of a remedy that precludes COAH from taking the liberty to fashion a new growth share methodology that 1) allows for the devising of residential and commercial affordable housing ratios for projected need that *613 are not tied to a regional need for affordable housing, and 2) leaves open-ended how or whether projected need for a housing region will be fulfilled. The FHA is replete with references tying affordable housing obligations to a region, not obligations formed on a statewide basis. And, it requires a specifically allotted number of units for satisfaction of both present and prospective need based on a housing region.
The FHA defines “prospective need” as “based on development and growth which is reasonably likely to occur in a region or a municipality.” N.J.S.A. 52:27D-304(j) (emphasis added). A “housing region” is specifically defined as “a geographic area of not less than two nor more than four contiguous, whole counties which exhibit significant social, economic and income similarities.” N.J.S.A. 52:27D-304(b). It is not a statewide, geographic area.
The Legislature also declared that “low income housing” must be provided to those households meeting the low-income standard “within the housing region.” N.J.S.A. 52:27D-304(c). Although COAH has broad power under N.J.S.A 52:27D-307, its duties must be consistent with the FHA’s working premise that affordable housing obligations for present and prospective need for low- and moderate-income housing be determined at regional levels. See N.J.S.A. 52:27D-307(a) (requiring COAH to “[djetermine housing regions”), (b) (requiring COAH to “[ejstimate the present and prospective need” at both “State and regional levels”), and (c) (authorizing COAH to establish criteria and guidelines for municipalities tethered to regional housing need).
Furthermore, even when COAH is placing an aggregate limit on a municipality’s allocation of units, a distinct allocation nevertheless is to be made based on the housing “region’s present and prospective need.” N.J.S.A. 52:27D-307(e). A municipality’s provision of its fair share, as presented in its housing element, may involve a variety of techniques, but there must be demonstrated a realistic opportunity for providing affordable housing within the municipality. N.J.S.A. 52:27D-311(a). The housing element is reviewed under that same standard, see N.J.S.A. 52:27D-313, and *614 the municipality’s achievement of substantive certification can only come from having a fair share plan “not inconsistent with achievement of the low and moderate income housing needs of the region,” N.J.S.A. 52:27D-314(a).
Although Section 307 of the FHA permits COAH to adjust prospective need methodology and resulting estimations based on, among other things, decisions of other branches of government, we disagree that Section 307’s oblique reference authorizes COAH, as an executive branch agency, to rewrite such core aspects of its enabling legislation, which are premised on an allocation basis for prospective need within a housing region. That argument is misguided. It defies the express language of Section 307, which requires the State Planning Commission to continue to provide updated information on “economic growth, development and decline projections for each housing region.” N.J.S.A. 52:27D-307; see N.J. Dep’t of Envtl. Prot. v. Huber, 213 N.J. 338, 365, 63 A.3d 197 (2013) (explaining that “we must examine th[e statute’s plain] language sensibly, in the context of the overall scheme in which the Legislature intended the provision to operate” (citation omitted)). Such an unprecedented, open-ended delegation of authority to an administrative agency is an illogical application of Section 307’s language.
This Court has recognized that, while COAH enjoys a breadth of discretion when selecting methodologies to implement the FHA, the agency may not dilute its duty to adopt regulatory methods that are consistent with statutory goals. See Warren, supra, 132 N.J. at 27, 622 A.2d 1257 (citing Van Dalen, supra, 120 N.J. at 246, 576 A.2d 819). COAH must not, “under the guise of interpretation,” enact regulations that are “plainly at odds with” the FHA In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489-91, 852 A.2d 1083 (2004) (internal quotation marks and citation omitted) (invalidating Department of Environmental Protection regulations concerning construction near wetlands transition areas as inconsistent with enabling statute and ultra vires); see also, e.g., Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, *615 529-30, 197 A.2d 673 (1964) (invalidating Division of Taxation regulation defining “immediate family” as inconsistent with enabling statute, noting that “if the regulation attempts to add to the statute something which is not there, it can furnish no sustenance to the statute”); In re Centex Homes, LLC, 411 N.J.Super. 244, 252, 267-68, 985 A.2d 649 (App.Div.2009) (invalidating Board of Public Utilities regulations governing service extensions, noting that “when regulations are promulgated without explicit legislative authority and implicate ‘important policy questions,’ they are better off decided by the Legislature” (quoting Borough of Avalon v. N.J. Dep’t of Envtl. Prot., 403 N.J.Super. 590, 607, 959 A.2d 1215 (App.Div.2008), certif. denied, 199 N.J. 133, 970 A.2d 1049 (2009), and citing Burlington Cnty. Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 598-99, 267 A.2d 533 (1970))). The policy adopted by the Legislature in the FHA cannot be ignored or rewritten by COAH to the degree that COAH has done through its wholly new growth share methodology in the Third Round Rules.
The FHA set a course that tracked the Mount Laurel II allocation methodology for satisfaction of present and prospective need based on housing region. COAH was not free to abandon that approach. Nor are we free to ignore the legislative choice.[16] The FHA embodies the remedial approach applicable in this state at this time. See Warren, supra, 132 N.J. at 28, 622 A.2d 1257 *616 (explaining that where regulation is contrary to legislative policies underlying agency’s implementing statute or where regulation “does not comport with [the statute’s] central purpose,” it will be invalidated); Toll Bros., supra, 173 N.J. at 572-73, 803 A.2d 53 (explaining that although it is preferred to harmonize judicial action with COAH’s regulatory determinations, “that deference was not intended to ‘dilute COAH’s duty to adopt regulatory methods that are consistent with the statutory goals’ ” (quoting Warren, supra, 132 N.J. at 27-28, 622 A.2d 1257)).
To sum up, the Legislature has to enact an alternative remedy—such as some version of the one proposed by COAH in the Third Round Rules—in order for that remedy to be statutorily permissible. The FHA’s language is an impediment to COAH’s unilateral decision to devise a wholly new approach to determining fair share. COAH may implement the FHA’s scheme, not come up with a wholly new one. See ibid. The FHA does not authorize COAH to rewrite its substantive provisions. That power was not conferred through the FHA’s inclusion of provisions containing vague references about COAH’s general authority to implement the FHA
The Legislature may determine to authorize new avenues for addressing regional need and the promotion of affordable housing. And, it may do so in ways that we do not attempt to circumscribe in this opinion because we do not know the breadth of considerations that may be brought forth through informational legislative hearings on the subject. Nevertheless, it is the Legislature that must devise the parameters to such an approach. It must craft new legislation if that is the course it wishes to take. Our courts can and should exercise caution and defer to such solutions when appropriately drafted by the Legislature. See N.J. Ass’n on Correction v. Lan, 80 N.J. 199, 220, 403 A.2d 437 (1979) (acknowledging importance of deference to legislative enactments addressing general welfare (citation omitted)); Roe v. Kervick, 42 N.J. 191, 230, 199 A.2d 834 (1964) (recognizing value of deference when *617 reasonable minds could differ and issue to be remedied “involves a concept which varies with the needs of the times”).
Although the Legislature may consider enacting an alternative form of remedy for the promotion of affordable housing in the housing regions of this state, see Hills, supra, 103 N.J. at 65, 510 A.2d 621 (“No one should assume that our exercise of comity today signals a weakening of our resolve to enforce the constitutional rights of New Jersey’s lower income citizens. The constitutional obligation has not changed; the judiciary’s ultimate duty to enforce it has not changed; our determination to perform that duty has not changed.”), enforcement of the constitutional obligation is still a matter that may be brought to the courts.
III.
A.
With the declaration that the growth share methodology is inconsistent with the FHA and thus COAH’s regulations ultra vires, we briefly address the other numerous challenges to the Third Round Rules in this consolidated appeal. The challenges share a common theme of expressing various views on the growth share methodology on which municipal obligations would be based in the third round. In our view, the Third Round Rules are inextricably linked to the new growth share methodology that is incompatible with current FHA requirements. The growth share pillar to the Third Round Rules’ allocation of municipal obligations is not severable, notwithstanding the severability clause contained in the regulations at N.J.A.C. 5:97-1.3. See Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 345, 289 A.2d 257 (1972) (“Severability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principal object of the statute.”).
For example, the procedural rules, in subchapters (2) and (3) of N.J.A.C. 5:96, which describe the filing requirements for a munici *618 pality’s housing element and Fair Share Plan, and the subsequent, substantive certification that a municipality can seek from COAH, have inherent in them satisfaction of prior round, rehabilitation share, and growth share obligations. They cannot stand as adopted. Similarly, the enforcement provisions of subchapter (10) of N.J.A.C. 5:96, as well as the monitoring provisions of subchapter (11), become impractical because those agency powers are tied to evaluation and satisfaction of affordable obligations, including those obtained via growth share. See N.J.A.C. 5:96-10.4(a).
Equally, the substantive regulations codified in N.J.A.C. 5:97 are tied to municipalities’ housing element plans. See N.J.A.C. 5:97-2.0 to -2.5. Subchapter 3 also is replete with explanations of how, among other things, a fair share plan, N.J.A.C. 5:97-3.2, a rental housing requirement, N.J.A.C. 5:97-3.4, rental bonuses, N.J.A.C. 5:97-3.5, -3.6, and -3.7, and other bonuses operate in conjunction with growth share, see, e.g., N.J.A.C. 5:97-3.20 (discussing cap on bonus credits as percentage of projected growth share obligation). Subsection 5 has similar difficulty surviving. See N.J.A.C. 5:97-5.6 (allowing municipality to petition for adjustment of projections underlying growth share), -5.7 (addressing potential growth share opportunities and is intertwined with -5.6), and -5.8 (setting 1000 unit cap on growth share).
Thus, the growth share methodology’s intertwinement with the entire regulatory program is inseparable from the new regulatory scheme fashioned by COAH for municipal third-round obligations and how they may be satisfied because it is so pervasively woven into the entire regulatory program that it cannot be surgically removed. See Wash. Nat’l Ins. Co. v. Bd. of Review of N.J. Unemployment Comp. Comm’n, 1 N.J. 545, 556, 64 A.2d 443 (1949) (“[Tjhere must be such manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative.”). It requires that the regulations be invalidated and new regulations for the third round be adopted. Because we hold today that a growth share approach is incompatible with the FHA, *619 we need not delve further into the differences among the challengers’ arguments about growth share as presented in their petitions.
Concerning some parties’ argument before this Court that subchapter 6 (zoning for inclusionary developments), does not appear tied to a growth share approach, we conclude that such an argument sounds in policy. As such, it is better advanced to the policymakers: either to the Legislature, which may choose to take up the question of whether to allow a new growth share methodology, or to the agency that must adopt new regulations to fill the void created by invalidation of the current Third Round Rules. Rule adoption is not the role of this Court.[17]
With respect to the remainder of the Appellate Division’s pronouncements on the invalidity of the Third Round Rules under the FHA, we substantially affirm its judgment with the notable exception of its invalidation of the provision addressing compliance bonus credits in N.J.A.C. 5:97-3.17. As to that provision, we express no opinion as to whether the agency’s choice was so wide of the mark as to its assessment of what is necessary to promote compliance. Because the rules require that they be redone, in toto, we reserve judgment on what COAH may choose to do in its revamped rules and will review those judgments on the record then presented if the agency’s choice is challenged. For now, we express no opinion on the Appellate Division’s assessment of that issue.
Our conclusion requires a new adoption of regulations to govern the third round municipal obligations consistent with the strictures of the FHA.
*620 B.
Rules to govern the third round cannot wait further while time is lost during legislative deliberations on a new affordable housing approach. A remedy must be put in place to eliminate the limbo in which municipalities, New Jersey citizens, developers, and affordable housing interest groups have lived for too long. Accordingly, we endorse the Appellate Division’s quick deadline for reimposing third-round obligations based on the previous rounds’ method of allocating fair share obligations among municipalities.[18] To the extent that this record reveals that most interested parties do not wish for that method to last for long, the remedy we impose today will incentivize prompt legislative attention to this subject.
IV.
In conclusion, the Third Round Rules cannot stand. They are plainly at odds with the FHA, which incorporated the Mount Laurel II remedy. Although our decision today signals that our remedy imposed thirty years ago should not be viewed as a constitutional straightjacket to legislative innovation of a new remedy responsive to the constitutional obligation, the FHA remains the current framework controlling COAH’s actions. With respect to the current version of the FHA, the Third Round Rules are ultra vires. We endorse the remedy imposed by the Appellate Division.
*621 As modified by this opinion, the judgment of the Appellate Division is affirmed.

 Filtering occurs when "newer, more desirable housing options bec[oJme available in the housing market, [prompting] middle- and upper-income households [to] move out of the existing housing, making it available ... for a lower- *592 income household.” Ibid. " 'Residential conversion’ occurs when additional dwelling units [are] created from already existing structures." Ibid. " 'Spontaneous rehabilitation’ occurs when dilapidated housing, affordable to low- and moderate-income households, [is] rehabilitated by the private market without the assistance of any government program.” Ibid.

 The Second Round Rules were due to expire in 1999. COAH did not adopt Third Round Rules until 2004, a delay characterized by the Appellate Division as “dramatic/' “inexplicable/' and frustrating the public policies embodied by the Mount Laurel line of cases. In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J.Super. 61, 95-96, 855 A.2d 582 (App.Div.2004), certif. denied, 182 N.J. 630, 868 A.2d 1033 (2005).

 The parties are: Clinton Township; Bedminster Township; Bernards Township; Township of Bethlehem; Town of Clinton; Greenwich Township; Montgomery Township; Borough of Peapack and Gladstone; Readington Township; Borough of Roseland; Union Township, Hunterdon County; and Marvin J. Joss, a New Jersey resident.

 The following amici curiae participated in this appeal: The Corporation for Supportive Housing and Supportive Housing Association of New Jersey; New Jersey Future, American Planning Association, American Planning Association-New Jersey Chapter, and the Housing & Community Development Network of New Jersey; New Jersey State Conference of the National Association for the Advancement of Colored People and Latino Action Network; The International Council of Shopping Centers; Pennsauken Township and Township of Montclair; American Civil Liberties Union of New Jersey Foundation; Catholic Charities, Diocese of Camden, Inc., Catholic Charities, Diocese of Metuchen, Catholic Charities, Diocese of Paterson, and Catholic Charities, Diocese of Trenton; Legal Services of New Jersey.

 The late Professor John Payne of Rutgers School of Law—Newark, who advocated for the affordable housing remedies imposed by the Court in Mount Laurel II, advanced the concept of growth share.

 In a hypothetical, Professor Payne suggested that twenty-five percent of market-rate growth should be allocated to affordable housing. Id. at 7 & n. 3. That is a 4:1 ratio, the same as that selected by COAH in its revised Third Round Rules.

 Adjusted projected need was calculated by adjusting the total projected need based on various secondary sources, including demolitions, filtering, residential conversion, and publicly assisted housing creation. N.J.A.C. 5:94, Appendix A at 94-46.

 When those rules were initially challenged, Judge Cuff found that COAH had not shown that sufficient vacant developable land existed in each region such that the growth share ratios would generate sufficient housing to meet the regional need. In re N.J.A.C. 5:94, supra, 390 N.J.Super, at 52-54, 914 A.2d 348. In addition, the panel observed that COAH’s growth share approach placed no check on municipalities to prevent them from adopting zoning regulations that would retard growth. Id. at 55-56, 914 A.2d 348. The panel remanded the case to COAH to adopt new rules within six months. Id. at 88, 914 A.2d 348. The agency ultimately issued the revised Third Round Rules in June 2008.

 Total need for low- and moderate-income affordable housing was ascertained by determining the additional need ior low- and moderate-income households in 2018 as compared to 1999. N.J.A.C. 5:97, Appendix A at 97-48.5 to -51. That figure was primarily based on the estimate of additional housing units that would exist in 2018—377,190—and the assumption that the number of low- and moderate-income households would remain constant at 37.7 percent. Id. at 97-45 to -49. However, those figures were adjusted to compensate for vacant housing units, persons with low incomes who had substantial assets and had paid off their mortgages, and persons living in group quarters. Id. at 97-49 to - 51.

 This figure adds together the projected number of additional housing units (for 2018 as compared to 2004) and the projected number of replacement units, and then subtracts from that total the units necessary to deliver prior round obligations to avoid double counting. N.J.A.C. 5:97, Appendix A at 97-48.5, -54 to -55.

 Despite regulatory statements suggesting the contrary, see N.J.A.C. 5:97— 2.2(e) (stating that if actual growth is less than projected growth, municipalities must still “continue to provide a realistic opportunity for affordable housing to plan for the projected growth share through inclusionary zoning or any of the mechanisms permitted by N.J.A.C. 5:97-6"); NJ.A.C. 5:97-2.5(e) (using nearly identical language), COAH confirmed at oral argument that the regulations intended to hold municipalities responsible for creating affordable housing units consistent with only their actual growth.

 By contrast, a municipality that grew more than projected would incur an obligation for more affordable housing than originally projected based on its substantial growth.

 Since this Court’s Mount Laurel I decision, the Legislature has enacted a variety of environmental statutes, including the Pinelands Protection Act, NJ.S.A. 13:18A—1 to -58, the Right to Farm Act, NJ.S.A. 4:1C-1 to -10.4, the Freshwater Wetlands Protection Act, NJ.S.A. 13:9B-1 to -30, the Garden State Preservation Trust Act, NJ.S.A. 13:8C-1 to -42, and the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35. See Taskforce Findings & Recommendations, supra, at 5. These statutes, taken collectively, invariably have influenced new home development.

 Although the exact numbers are in some dispute, a recent COAH document, based on a compilation of the information provided by municipalities, states that 60,242 new affordable housing units have been created, and 14,854 affordable housing units have been rehabilitated statewide. COAH, Proposed and Completed Affordable Units 11 (Mar. 1, 2011), available at http://www.state.nj.us/dca/ services/lps/hss/transinfo/reports/units.pdf. The numbers are not staggering and might well have come into being based on the sheer amount of development that this state experienced during the same period of time. Additionally, tens of thousands of affordable new and rehabilitated units have been planned, but not yet constructed. See ibid. On the other hand, there is evidence from other jurisdictions that growth-share-type approaches have proven successful at creating affordable housing. See N.J.A.C. 5:97, Appendix F at 97-223 to -228. We recognize, however, that none of those programs are directly comparable; most are mandatory residential set-aside requirements that have less ambitious affordable housing ratios and a narrower scope than COAH’s growth share rules. See ibid.

 Indeed, under a "pure" growth share approach as originally espoused by Professor Payne, the methodology appears to entirely forgive municipalities their prior round obligations, thus rewarding those municipalities that have managed to evade the COAH process through delay or other bad faith tactics. See Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6-9. Furthermore, it would permit a municipality to remain wholly exclusionary by choosing not to grow. Id. at 9.
A pure growth share approach has its flaws, which some have suggested potentially could be of constitutional dimension. See John M. Payne, The *612 Unfinished Business of Mount Laurel II, in The Unfinished Agenda, supra, at 5-19. In contrast, the revised Third Round Rules are a hybrid approach, based on actual growth, with both residential and nonresidential components. The rules constitute a hybrid methodology because they continue to hold municipalities responsible for their rehabilitation share and for prior round obligations.

 To the extent that the dissent maintains that the Third Round Rules’ failure to address regional need is permissible under the FHA, such an interpretation runs afoul of the FHA’s express references to regional housing need as the linchpin for calculating municipal obligations. The FHA, which the dissent agrees codified the Mount Laurel decisions, is replete with examples of how sound planning principles must be employed contingent on a municipality satisfying its fair share of a region’s need for low- and moderate-income housing. See supra at 613-14, 74 A.3d at 913. Indeed, the legislative findings highlight the FHA’s regional approach as the Legislature's choice. See N.J.S.A. 52:27D-302(e) (permitting municipalities to "adopt appropriate phasing schedules for meeting their fair share, so long as the municipalities permit a timely achievement of an appropriate fair share of the regional need for low and moderate income housing”).

 Some parties advanced policy arguments before this Court as to how new regulatory provisions should provide for a safety valve for inclusionary municipalities (advanced by Middletown Township for the first time before this Court), and seeking endorsement of a different version of growth share (advanced by the Eleven Municipalities for the first time before this Court). Those arguments are best advanced in the legislative arena.

 A note on the dissent. The dissent mischaracterizes the remedy imposed today to fill the void created by rejection of the current Third Round Rules, which we hold are ultra vires under the FHA. The remedy is not "drastic" or "an overhaul.” See post at 628, 632-33, 74 A.3d at 922, 925. In fact, the remedy is the remedial formula adopted by COAH, consistent with the FHA, and one even COAH agrees can be implemented quickly. See post at 632, 74 A.3d at 924-25.
To reiterate, the FHA remains the current framework under which COAH must operate. The Legislature may review and amend the FHA if it so desires. Further, to the extent that the dissent forecasts a gloomy reaction to potential legislative change, post at 631-32, 74 A.3d at 924, this Court is not in the business of such speculation.