NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3323-15T1

IN RE DECLARATORY JUDGMENT
ACTIONS FILED BY VARIOUS
MUNICIPALITIES, COUNTY OF
OCEAN, PURSUANT TO THE
SUPREME COURT'S DECISION IN
In Re Adoption Of N.J.A.C.
5:96, 221 N.J. 1 (2015).

_____

| APPROVED FOR PUBLICATION |
| --- |
| **July 11, 2016** |
| **APPELLATE DIVISION** |

Argued June 6, 2016 — Decided July 11, 2016

Before Judges Lihotz, Fasciale and Nugent.

On appeal from an interlocutory order of
Superior Court of New Jersey, Law Division,
Ocean County, Docket No. L-2640-15.

Jeffrey R. Surenian argued the cause for
appellant Township of Barnegat (Jeffrey R.
Surenian & Associates, L.L.C., attorneys;
Mr. Surenian, Michael A. Jedziniak, Erik C.
Nolan, and Michael J. Edwards, on the
briefs).

Kevin D. Walsh argued the cause for
respondent Fair Share Housing Center (Mr.
Walsh and Adam M. Gordon, on the brief).

Stephen M. Eisdorfer argued the cause for
respondent New Jersey Builders Association
(Hill Wallack, L.L.P., attorneys; Mr.
Eisdorfer, Thomas F. Carroll, III, and Emily
P.W. Santoro, on the brief).

Edward J. Buzak argued the cause for
respondent NJ State League of Municipalities
(The Buzak Law Group, L.L.C., attorneys; Mr.
Buzak, on the brief).

Richard J. Hoff, Jr. argued the cause for respondent Highview Homes, L.L.C. (Bisgaier Hoff, L.L.C., attorneys; Mr. Hoff and Danielle Novak Kinback, on the brief).

Edward J. Boccher argued the cause for respondent Township of Brick (DeCotiis, Fitzpatrick & Cole, L.L.P., attorneys; Mr. Boccher, of counsel and on the brief; Louis N. Rainone and Wendy Rubinstein, on the brief).

Gilmore & Monahan, P.C., attorneys for respondents Township of Jackson and Township of Little Egg Harbor, join in the brief of appellant Township of Barnegat.

DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C., attorneys for respondent Township of Toms River, join in the brief of appellant Township of Barnegat.

Gluck Walrath, L.L.P., attorneys for respondent Township of Ocean, join in the brief of appellant Township of Barnegat.

Dasti, Murphy, McGuckin, Ulaky, Koutsouris, & Connors, attorneys for respondent Township of Stafford, join in the brief of appellant Township of Barnegat.

Jonathan E. Drill argued the cause for amicus curiae The Municipal Group (Stickel, Koenig, Sullivan & Drill, L.L.C., attorneys; Mr. Drill, of counsel and on the brief).

Donald J. Sears argued the cause for amicus curiae Township of South Brunswick.

Ronald L. Israel argued the cause for amicus curiae Colts Neck Township (Chiesa Shahinian & Giantomasi, P.C., attorneys; Mr. Israel, on the brief).

Archer & Greiner, P.C., attorneys for amicus curiae Township of Middletown (Brian Michael

Nelson, of counsel and on the brief; Kira S. Dabby, on the brief).

Michael B. Steib, attorney for amicus curiae Township of Millstone.

Lowenstein Sandler, L.L.P., attorneys for amicus curiae American Planning Association-New Jersey Chapter, New Jersey Future, and the Housing & Community Development Network of New Jersey (Catherine Weiss and Katy Akopjan, on the brief).

Disability Rights New Jersey, amicus curiae, for itself, and The Supportive Housing Association of New Jersey, The Housing Community Development Network of New Jersey, Collaborative Support Programs of New Jersey, The Alliance for the Betterment of Citizens with Disabilities, The New Jersey Association of Community Providers, The Arc of New Jersey, New Jersey Association of Mental Health and Addiction Agencies, The Coalition of Mental Health Consumer Organizations, The System of Care Association, The New Jersey Psychiatric Rehabilitation Association, The Mental Health Association in New Jersey, Advancing Opportunities, Community Access Unlimited, The Community Health Law Project, and Autism New Jersey (Iraisa Orihuela-Reilly, Susan Saidel, and Joseph B. Young, on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

In the wake of the New Jersey Supreme Court's order requiring judicial oversight of municipal housing obligations to preclude exclusionary development schemes, see In re Adoption of N.J.A.C. 5:96 & 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) (In re N.J.A.C. 5:96 II), we granted

the Township of Barnegat's[1] motion for leave to appeal from an interlocutory order entered by a designated Mount Laurel[2] judge, directing the court's Special Regional Master to include, as a new, "separate and discrete" component, an additional calculation for establishing a municipality's affordable housing need from 1999 to 2015 (the gap period).[3] In entering the order, the judge concluded that a municipality's fair share affordable housing obligation for the third-round cycle is comprised of (1) its newly-created, court-imposed, "separate and discrete" gap-

---

[1] We granted leave to appeal on behalf of the Township of Barnegat, In re Twp. of Barnegat, L-1856-15, along with twelve consolidated declaratory judgment complaints filed by Ocean County municipalities: In re Borough of Beach Haven, L-2217-15; In re Township of Berkeley, L-1855-15; In re Township of Brick, L-1857-15; In re Township of Jackson, L-1879-15; In re Township of Lacey, L-1912-15; In re Township of Little Egg Harbor, L-1911-15; In re Township of Manchester, L-1910-15; In re Township of Ocean, L-1884-15; In re Borough of Pine Beach, L-1687-15; In re Borough of Point Pleasant, L-1858-15; In re Township of Stafford, L-1913-15; and Township of Toms River, L-1867-15.

[2] S. Burlington Cty. NAACP v. Twp. of Mount Laurel, 67 N.J. 151 (Mount Laurel I), appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975); and S. Burlington Cty. NAACP v. Twp. of Mount Laurel, 92 N.J. 158 (1983) (Mount Laurel II).

[3] The February 18, 2016 order includes a signature of another judge who handled two of these thirteen consolidated matters, and who joined the opinion of the Mount Laurel judge. Reference in our decision to the "court" or "judge" refers to the Mount Laurel judge who entered the order and rendered the opinion under review.

period obligation; (2) unmet prior round obligations from 1987 to 1999; (3) present need; and (4) prospective need.

We granted amicus status to the following entities that urged us to reverse the order: Colts Neck Township; Township of Millstone; Township of Middletown; Township of South Brunswick; The Municipal Consortium; and the Municipal Group.[4] The New Jersey State League of Municipalities (NJLM) also appeared before the court as a respondent.

These entities contend the court is without legal authority to create a "separate and discrete" gap-period obligation. Instead, they maintain that a municipality's affordable housing obligation for the third-round cycle is comprised of unmet prior round obligations from 1987 to 1999, present need, and prospective need. They argue that prospective need projects into the future a town's housing obligation for ten years from the current time, not from the beginning of the gap period in 1999. They acknowledge that the identifiable housing need that arose during the gap period would be captured by a town's present need obligation, but they are adamant that there is no "separate and discrete" gap-period obligation.

---

[4] The Municipal Group is a formal coalition of hundreds of municipalities organized to address fair share methodological issues in the aftermath of the Court's opinion in In re N.J.A.C. 5:96 II.

We granted amicus status to the following entities that urged us to affirm the order: Disability Rights New Jersey; the New Jersey Chapter of the American Planning Association; New Jersey Future; and the Housing and Community Development Network.

Fair Share Housing Center (Fair Share), New Jersey Builders Association (NJBA), and Highview Homes, L.L.C. (Highview) appeared before the court as intervenors and, pursuant to In re N.J.A.C. 5:96 II, Fair Share participated as an interested party. Fair Share agrees that a municipality's affordable housing obligation for the third-round cycle is comprised of unmet prior round obligations from 1987 to 1999, present need, and prospective need. Fair Share concedes that a town's prospective need requires calculations projecting forward ten years. Fair Share asserts, however, that prospective need also requires a municipality to perform housing calculations retroactively during the gap period. Therefore, Fair Share maintains that gap-period housing need comprises part of a town's calculation of its prospective need. As a result, Fair Share defines prospective need differently than those entities urging us to reverse the order. For Fair Share, prospective need covers a period of twenty-seven years: from 1999 to the present, and then ten years into the future. Thus, to the

extent a municipality is required to establish its prospective need from 1999 to the present, and then ten years into the future, Fair Share urges us to uphold the court-imposed "separate and discrete" gap-period housing obligation.

The narrow legal issue on appeal is whether a "separate and discrete" gap-period affordable housing obligation is authorized by (1) the core principles of the Mount Laurel doctrine, as codified in the Fair Housing Act of 1985 (FHA), N.J.S.A. 52:27D-301 to -329; and (2) In re N.J.A.C. 5:96 II. Resolution of this legal question specifically addresses whether a municipality's prospective need involves a retroactive housing obligation starting in 1999. Our focus, therefore, is on the propriety of the court's conclusion that such a "separate and discrete" obligation is "constitutionally mandated."

Applying the core principles of the Mount Laurel doctrine and the plain language of the FHA, including its unambiguous definition of "prospective need" — a forward "projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality," N.J.S.A. 52:27D-304(j) — and following the Supreme Court's admonition not to become an alternative administrative decision maker for unresolved policy issues surrounding the Third Round Rules, we hold that the FHA does not require a municipality to

retroactively calculate a new "separate and discrete" affordable housing obligation arising during the gap period. Pursuant to In re N.J.A.C. 5:96 II, "previous methodologies employed in the First and Second Round Rules should be used to establish present and prospective statewide and regional affordable housing need," and prior round unfulfilled obligations "should be the starting point for a determination of a municipality's fair share responsibility." Supra, 221 N.J. at 30 (emphasis added). As the Court instructed, subject to the guidelines and principles it outlined in In re N.J.A.C. 5:96 II, Mount Laurel judges

> may confidently utilize similar discretion [used by the Council on Affordable Housing (COAH)] when assessing a town's plan, if persuaded that the techniques proposed by a town will promote for that municipality and region the constitutional goal of creating the realistic opportunity for producing its fair share of the present and prospective need for low- and moderate-income housing.
>
> [Ibid. (emphasis added).]

We emphasize that under our tripartite system of government, the imposition of a new retrospective calculation, designed to establish affordable housing need during the gap period — a new methodology that essentially addresses "unresolved policy details of replacement Third Round Rules" — is best left for consideration by the Legislative and Executive branches of government, where public policy issues associated with such an

additional "separate and discrete" obligation can be fairly and fully debated in the public forum. The Legislature may craft new legislation addressing any gap period between housing cycles if that is the course it wishes to take. Enforcement of subsequent legislation promoting affordable housing needs — and its effect on a municipality's <u>Mount Laurel</u> obligation — would still be a matter that may be brought to the courts.

The judge did not determine whether any of the town's plans will satisfy their constitutional affordable housing obligations. At this point in the litigation, his main legal concern was whether to impose a "separate and discrete" affordable housing obligation for the gap period, in addition to a town's unmet prior round, present, and prospective obligations. Having resolved that legal question, the judge may now determine whether the towns have met their constitutional goal of creating "[a] <u>realistic opportunity</u> for producing its fair share of the <u>present and prospective</u> need for low- and moderate-income housing." <u>In re N.J.A.C. 5:96 II</u>, <u>supra</u>, 221 <u>N.J.</u> at 30 (emphasis added).

We therefore reverse the order and remand for further proceedings.

We begin by reviewing the pertinent principles of the Mount Laurel doctrine, the enactment of the FHA, the role of COAH, and the Supreme Court's decision in In re N.J.A.C. 5:96 II.[5]

In Mount Laurel I, the Supreme Court concluded that developing municipalities must "presumptively make realistically possible an appropriate variety and choice of housing" through land use regulations. Supra, 67 N.J. at 174. The Court stated that such municipalities "cannot foreclose the opportunity of the classes of people mentioned for low[-] and moderate[-income] housing and in its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need." Ibid. The Court determined that land use regulations are encompassed in the State's police power, required such regulations to "promote public health, safety, morals or the general welfare," and concluded "a zoning enactment which is contrary to the general welfare is invalid." Id. at 175.

Approximately eight years later, the Court returned to the issue. In Mount Laurel II, supra, 92 N.J. 158, the Court

---

[5] In general, the Court determined COAH failed to promulgate valid Third Round Rules, concluded that exhausting administrative remedies before COAH was therefore no longer necessary, and established procedures for affordable housing matters to proceed before designated Mount Laurel judges.

reaffirmed the doctrine and fashioned a judicial remedy for determining a municipality's constitutional obligation to provide for low- and moderate-income housing. <u>In re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Hous.</u>, 215 <u>N.J.</u> 578, 587-89 (2013) (<u>In re N.J.A.C. 5:96 I</u>). Adding teeth to the doctrine, the Court sanctioned a builder's remedy, which permitted builder-plaintiffs to sue for the opportunity to construct housing at higher densities than a municipality would allow. <u>Id.</u> at 589. In strengthening the <u>Mount Laurel</u> doctrine, the Court explained that the core of the doctrine was a municipality "would satisfy [its] constitutional obligation by affirmatively affording a realistic opportunity for the construction of its fair share of the present and prospective regional need for low[-] and moderate[-income] housing." <u>Mount Laurel II</u>, <u>supra</u>, 92 <u>N.J.</u> at 205. The Court stated that a realistic opportunity depends on "whether there is in fact a likelihood — to the extent economic conditions allow — that the lower income housing will actually be constructed." <u>Id.</u> at 222. Although the Court devised a scheme to address resolution of litigation in this field, it reiterated its preference for legislative action. <u>Id.</u> at 212-13. Two years later, and in the aftermath of <u>AMG Realty Co. v. Township of Warren</u>, 207 <u>N.J. Super.</u> 388, 453 (Law Div. 1984), which

articulated a method for calculating affordable housing obligations that substantially impacted the likelihood of whether lower income housing would actually be constructed, the Legislature enacted the FHA.

The FHA codified the core constitutional holding undergirding the <u>Mount Laurel</u> obligation. <u>In re N.J.A.C. 5:96 I</u>, <u>supra</u>, 215 <u>N.J.</u> at 584. The FHA required "reasonable fair share housing guidelines and standards." <u>N.J.S.A.</u> 52:27D-302(d). The FHA created COAH, <u>N.J.S.A.</u> 52:27D-305, which was designed to provide an administrative alternative to litigating constitutional compliance in exclusionary zoning actions. <u>In re N.J.A.C. 5:96 II</u>, <u>supra</u>, 221 <u>N.J.</u> at 7-8, 11.

COAH's primary responsibility was to assign and determine municipal affordable housing obligations. <u>Id.</u> at 7 (citing <u>N.J.S.A.</u> 52:27D-305, -307). The FHA required COAH to enact and thereafter update regulations that established statewide affordable housing need; to assign an affordable housing obligation to each municipality for its designated region; and to identify the techniques available to municipalities in addressing the assigned obligation. <u>Ibid.</u> (citing <u>N.J.S.A.</u> 52:27D-307, -308). The criteria and guidelines that the FHA directed COAH to adopt were targeted for "[m]unicipal determination of its present and prospective fair share of the

housing need in a given region which shall be computed for a [ten]-year period." N.J.S.A. 52:27D-307(c)(1). The FHA defined prospective need:

> "Prospective need" means a projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality, as the case may be, as a result of actual determination of public and private entities. In determining prospective need, consideration shall be given to approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission established by sections 1 through 12 of P.L.1985, c.398 (C.52:18A-196 et seq.).
>
> [N.J.S.A. 52:27D-304(j).]

Although municipalities were free to resolve constitutional Mount Laurel obligations in the courts, the FHA preferred resolution in an administrative forum. In re N.J.A.C. 5:96 II, supra, 221 N.J. at 4.

The FHA encouraged and rewarded voluntary municipal compliance by (1) providing a period of immunity from civil lawsuits to towns that participated in the process for demonstrating constitutional compliance (the exhaustion-of-administrative-remedies requirement); and (2) providing a presumption of validity in any later exclusionary zoning litigation for municipalities who secured from COAH a substantive fair housing plan certification. Ibid. The

viability of these provisions was subject to COAH's updating of housing obligations, as well as related substantive and procedural rules. Ibid.

In 1986, COAH began adopting rules delineating the affordable housing obligations of municipalities. In re Adoption of N.J.A.C. 5:94 and 5:95 by the N.J. Coal. on Affordable Hous., 390 N.J. Super. 1, 23 (App. Div.), certif. denied, 192 N.J. 71 (2007) (In re N.J.A.C. 5:94). COAH adopted rules covering the periods of 1987 to 1993 — the First Round Rules — and 1993 to 1999 — the Second Round Rules. In re N.J.A.C. 5:96 I, supra, 215 N.J. at 590. These rules generally utilized a methodology for calculating affordable housing obligations employed before the Legislature enacted the FHA. Ibid.

In the First Round Rules, COAH defined present need as "the total number of deficient housing units occupied by low[-] or moderate[-income] households as of July 1, 1987." Ibid. (quoting N.J.A.C. 5:92-1.3). COAH used several factors to establish present need, such as "overcrowding, age of unit, and lack of plumbing, kitchen or heating facilities as indicators of dilapidated housing." Id. at 590-91.

The First Round Rules also incorporated the statutory definition of prospective need as "a projection of low[-] and

moderate[-income] housing needs based on development and growth . . . reasonably likely to occur in a region or a municipality." Id. at 591 (quoting N.J.A.C. 5:92-1.3). COAH analyzed statistics to project forward the number of "'low- and moderate-income households' that would form between 1987 and 1993." Ibid. (quoting N.J.A.C. 5:92, Appendix A at 92-49). In determining prospective need, COAH considered such things as municipalities' "approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission." Ibid. (quoting N.J.A.C. 5:92-1.3).

For the Second Round Rules, COAH used the same methodologies employed in the First Round Rules. Id. at 592. COAH also adopted additional regulations granting credits and various adjustments to reduce municipalities' fair share figures. Ibid. (summarizing the adopted regulations granting credits and adjustments). Various legal challenges to the First and Second Round Rules failed. Ibid.

Essentially, the methodology of allocating municipalities' affordable housing obligations largely followed the remedial approaches established by Mount Laurel II and AMG Realty. Id. at 593. COAH first calculated the need for affordable housing in each of the State's regions, then allocated to each municipality its fair share of the present and prospective

regional need. <u>Ibid.</u> A municipality would be assigned a proportionate fair share of the region's housing need based on economic projections and its capacity to accommodate affordable housing. <u>Ibid.</u> A municipality would subject itself to the possibility of defending a builder's remedy challenge if it failed to create a realistic opportunity for satisfying its assigned share. <u>Ibid.</u>

Although the Second Round Rules expired in 1999, COAH belatedly promulgated its first iteration of the Third Round Rules in 2004.[6] <u>Ibid.</u> The rule proposal published in the New Jersey Register explained that a municipality's fair share for the period from 1987 through January 1, 2014, would be calculated using three criteria:

> (1) a municipality's "rehabilitation share" based on the condition of housing revealed in the data gathered for the 2000 Census, previously known as a municipality's indigenous need; (2) a municipality's unsatisfied prior round obligation (1987 through 1999), satisfaction of which will be governed by the second round rules; and (3) a municipality's "growth share" based on housing need generated by statewide job growth and residential growth from 1999 through 2014.

---

[6] We characterized this delay as "dramatic," "inexplicable," and frustrating the public policies embodied by the <u>Mount Laurel</u> line of cases. <u>In re Six Month Extension of N.J.A.C. 5:91 et seq.</u>, 372 <u>N.J. Super.</u> 61, 95-96 (App. Div. 2004) (<u>In re Six Month</u>), <u>certif. denied</u>, 182 <u>N.J.</u> 630 (2005).

> [Id. at 593-94 (quoting In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 27).]

During the gap period, we considered challenges to the validity of the Third Round Rules and remanded the matter to COAH on two occasions with instructions to adopt revised Third Round Rules.

Our first remand to COAH with instructions to adopt revised rules occurred in 2007. In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 47. At that time, we sustained some but rejected many of the challenges to the first iteration of the Third Round Rules. Importantly, Judge Mary Catherine Cuff, writing for the panel, noted that "municipalities are responsible for fulfilling their prior round obligation." Id. at 28 (citing N.J.A.C. 5:94-2.1(a)(2)).

> Judge Cuff's opinion rejected appellants'[7] arguments that the "rehabilitation share" of a municipality's affordable housing obligation, sometimes also referred to as present need, should include "cost burdened" low- and moderate-income households that reside in standard housing and households that lack permanent housing or live in overcrowded housing; that COAH's methodology for identifying substandard housing was "arbitrary and unreasonable"; that the [T]hird [R]ound

---

[7]  The appellants challenged the validity of COAH's substantive rules for the third round that calculated affordable housing needs from 1999 to 2014, as well as the validity of several regulations.

[R]ules improperly eliminated the part of the first and second round methodologies that required reallocation of excess present need in poor urban municipalities to other municipalities in the region; that the use of regional contribution agreements to satisfy part of a municipality's affordable housing obligations violates the Mount Laurel doctrine and federal and state statutory provisions; that the allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations unconstitutionally dilutes those obligations; and that the rule relating to vacant land adjustments violates the Mount Laurel doctrine and the FHA.

However, Judge Cuff's opinion invalidated the parts of the original [T]hird [R]ound [R]ules that reduced statewide and regional affordable housing need based on "filtering"; adopted a growth share approach for determining a municipality's fair share of prospective needs for affordable housing and excluded job growth resulting from rehabilitation and redevelopment in determining job growth; compelled developers to construct affordable housing without any compensating benefits; authorized a municipality to give a developer the option of payment of a fee in lieu of constructing affordable housing, but provided no standards for setting those fees; and authorized a municipality to restrict up to 50% of newly constructed affordable housing to households with residents aged fifty-five or over.

[In re Adoption of N.J.A.C. 5:96 and 5:97 by the N.J. Coal. on Affordable Hous., 416 N.J. Super. 462, 475-76 (App. Div. 2010) (emphasis added) (citations omitted), aff'd as modified, 215 N.J. 578 (2013).]

In 2010, Judge Stephen Skillman, also writing for a different panel, invalidated a substantial portion of the revised Third Round Rules, including the growth share methodology used by COAH, id. at 511-12; regulations concerning the preparation of fair share plans, id. at 487-88; presumptive incentives embodied in the regulations, id. at 488-93; and regulations concerning rental credits, id. at 493-95.

Judge Skillman upheld several of the regulations, however, such as the elimination of reallocated present need, id. at 500-02 (reasoning COAH possessed the authority to focus on municipalities' own obligations, see N.J.A.C. 5:97-2.4, rather than reallocating excess present need away from those overburdened with substantial housing); and COAH's decision to use the prior round obligations without updating the obligations based on actual household growth, id. at 498-500. Consequently, we redirected COAH to adopt new rules.

During the gap period, the New Jersey Supreme Court also invalidated revised Third Round Rules and issued deadlines for COAH to adopt new regulations. In re N.J.A.C. 5:96 I, supra, 215 N.J. at 619-20. Acknowledging the FHA had set a course tracking the Mount Laurel II allocation methodology for satisfaction of present and prospective need, the Court remarked that "the Third Round Rules' validity hinges in whether they are

consistent with the FHA." Id. at 612-17. In 2014, the Court granted COAH an additional five months to adopt new rules. In re N.J.A.C. 5:96 and 5:97, 220 N.J. 355, 355-56 (2014).

COAH failed to meet the extension deadline, which led the Court to grant Fair Share's motion in aid of litigants' rights in In re N.J.A.C. 5:96 II, supra, 221 N.J. at 5-6. The Court recognized the administrative process had become nonfunctioning. Id. at 5. As a result, the FHA's exhaustion-of-remedies requirement had been rendered futile. Ibid. Therefore, there no longer existed a legitimate basis to block access to the courts for resolution of municipal compliance with constitutional affordable housing. Ibid. Recognizing there existed various stages of municipal preparation during the gap period, the Court established a transitional process for exclusionary zoning actions to proceed. Ibid. The Court also emphasized:

> Importantly, nothing herein should be understood to prevent COAH from fulfilling its statutory mission to adopt constitutional rules to govern municipalities' Third Round obligations in compliance with the FHA. Nor should the action taken by this Court, in the face of COAH's failure to fulfill its statutory mission, be regarded as impeding the Legislature from considering alternative statutory remedies to the present FHA.
>
> [Id. at 6 (citation omitted).]

The Court developed a process which tracked the processes provided for in the FHA.  Id. at 29.  It did so to facilitate a return to agency proceedings in the event COAH promulgated new Third Round Rules.  Ibid.  In establishing the process for exclusionary zoning actions to proceed, the Court stated:

> [I]t is not this Court's province to create an alternate form of statewide administrative decision maker for unresolved policy details of replacement Third Round Rules . . . .  The courts that will hear such declaratory judgment applications or constitutional compliance challenges will judge them on the merits of the records developed in individual actions before the courts.  However, certain guidelines can be gleaned from the past and can provide assistance to the designated Mount Laurel judges in the vicinages.
>
> [Id. at 29-30 (emphasis added).]

The Supreme Court established procedures for addressing two classes of municipalities that were stranded by COAH's inability to adopt valid Third Round Rules.  Id. at 24-29 (outlining the procedures for municipalities that "made the effort to comply promptly with the Third Round Rules and . . . received a grant of substantive certification," and municipalities that had "participating" status with COAH).

Although presented with numerous opportunities to do so, at no point did the Court, the Legislature, or the Appellate Division impose an additional separate gap-period obligation.

Rather, in establishing a municipality's fair share affordable housing obligation, the focus consistently remained on present and prospective housing need.

## II.

We now turn to the proceedings conducted by the judge leading to his ruling that municipalities are "constitutionally mandated" to address the gap period as a "separate and discrete" component of their fair share Mount Laurel obligation.

Following the procedures established by the Court in In re N.J.A.C. 5:96 II, supra, 221 N.J. at 21-34, several Ocean County municipalities filed declaratory judgment actions seeking resolution of their Mount Laurel obligations. The judge undertook preliminarily to determine the present and prospective affordable housing needs of the municipalities. To reach this determination, the court reviewed several expert reports that expressed differing opinions on the subject.

The judge appointed Richard B. Reading as the Special Regional Master, who was to "assist the court in making the preliminary determination envisioned by the Supreme Court of the present and prospective needs." The judge allowed submissions of expert reports and expected to conduct a plenary hearing at which the court would address the conflicting expert opinions as

to the methodology for calculating the municipalities' affordable housing obligations.

On December 29, 2015, Mr. Reading submitted a report entitled "COAH's Un[-]adopted Third Round Methodology Calculation of 'Gap' Period Housing Needs." In this report, Mr. Reading listed these questions the judge identified in a case management order:

> 1) Is the methodology provided in Appendix D[8] of the current iteration of the [un-adopted] Third Round Rules an appropriate and correct methodology?
>
> 2) Do the trial courts have the authority to require a municipality to address the . . . 'gap' obligation component as part of a municipality's prior obligation?[9]

Mr. Reading concluded that the "methodology in Appendix D [did] not follow the methodologies utilized in the calculation of affordable housing needs employed in the [p]rior [r]ounds." He stated that "[a] review of the history of Mount Laurel did not disclose a methodology that expanded the calculation of fair share beyond [p]resent and [p]rospective [n]eed." He remarked that Sections 304 and 307 of the FHA established "prospective

---

[8]  Mr. Reading identified the un-adopted Third Round Rules as N.J.A.C. 5:99, Appendix D.

[9]  The third question, "[w]hat is the proper allocation of the 1000 unit cap . . . [and] how should the gap be applied to any 'gap period' need if one exists," is not at issue.

need as a period of ten years and includes a projection of housing needs based upon development and growth that is reasonably likely to occur." He determined that the "inclusion of the prior [gap period] within prospective need is contrary to prior round methodologies, the language of the FHA and history of determining affordable housing needs." As to "identifying and quantifying" the housing need from the gap period, Mr. Reading stated:

> [The unmet need arising during the gap period] was discussed in terms of the disposition of [low- and moderate-income] housing needs that existed . . . in the past. These households would be partially included by the [low- and moderate-income] households in over[]crowded or deficient housing units that are encompassed in the new calculation of [p]resent [n]eed. Those [low- and moderate-income] households that have occupied sound (non-deficient) housing units are already [in] housing and would not represent an identifiable need. Some [low- and moderate-income] households formed during the gap period may no longer represent an affordable housing need due to a variety of reasons including death, changes in income, increase or decrease in household size, retirement and/or relocation outside of New Jersey. . . . Although it may be possible to generate an estimate of such a residual need, such an estimate would be speculative.
>
> [(Emphasis added).]

Mr. Reading stated "there is a uniform consensus among the interested parties that the methodology provided in Appendix D

is not an appropriate and correct methodology for the calculation of affordable housing [gap-period] needs." He explained further that even though there existed this consensus rejecting COAH's un-adopted methodology, "an appropriate methodology for determining an affordable housing need [during the 1999-2015 'gap period' was] not . . . presented."[10]

On February 17, 2016, Mr. Reading issued a report entitled "Bridging the Gap, 1999-2015 'Gap' Period Affordable Housing Needs." In this report, Mr. Reading responded to expert opinions contained in reports submitted by Dr. David N. Kinsey, on behalf of Fair Share, and Econsult. After reviewing these opinions, Mr. Reading recommended to the judge that he "consider the inclusion of the [g]ap[-p]eriod, calculated distinctly and separately from [p]resent and [p]rospective [n]eed," which is a markedly different recommendation than what he expressed previously.

Mr. Reading stated Dr. Kinsey provided two alternatives for calculating affordable housing needs arising during the gap

---

[10]    Mr. Reading acknowledged, in a later report, Fair Share's contention that the gap-period should be included "within the extended 1999-2025 [p]rospective [n]eed." He also considered the NJLM and a report prepared by Econsult Solutions (Econsult), on behalf of a consortium of municipalities, stating there is no basis for "retrospective analysis of housing need, which has always been based on 'present and prospective need.'" (Emphasis added).

period: calculating the entire period from 1999-2025 as a prospective need, without a separation of the gap period and prospective need projection; and replicating COAH's 1994 recalculation of the 1987-1993 housing need (although Mr. Reading recognized that such a recalculation was done to adjust a prior (1987-1993) obligation, not to establish a methodology for addressing a lapse in assigned obligations).

Econsult provided a comprehensive methodology for establishing the 1987-1999 prior round obligations, the 2015 present need, and the 2015-2025 prospective need. Econsult's methodology did not include calculations for the gap period. Econsult critiqued Dr. Kinsey's two alternatives. As to the first alternative, Econsult maintained essentially that gap-period low- and moderate-income households living in deficient housing would be encompassed in present need, while low- and moderate-income households living in adequate housing would not represent an identifiable need. As to the second alternative, Econsult reiterated its positon that present need and prospective need combine to represent the entire fair share need of, in its opinion, Dr. Kinsey's calculation of retrospective or gap-period needs.

In his February 17, 2016 report, Mr. Reading stated that the gap-period issue had become a legal issue. He acknowledged

that all parties agreed low- and moderate-income households were formed during the gap period and have secured housing, some of which were deficient or overcrowded, which would be reflected in present need. As to the proper methodology for calculating municipalities' affordable housing need arising during the gap period, he concluded:

> The calculation of the <u>current needs</u> of the affordable hous[ing] <u>formed during the [gap period] is not</u> a process that is [e]mbedded in the [p]rior [r]ound methodology, [and] is <u>not projected ([p]rospective) need</u>, but <u>should be</u> undertaken as a <u>separate and discrete component of affordable housing need</u>. Prior submissions provided by [Fair Share] and Econsult on December 8, 2015 contended that the calculation for the [g]ap [p]eriod affordable housing needs were unnecessary because they were properly a part of the 1999-2025 [p]rospective [n]eed . . . or were unnecessary altogether because the FHA does not make any provision for a retrospective need . . . .
>
> . . . .
>
> Assertions that a determination of [g]ap [p]eriod affordable housing need cannot be reduced to a precise mathematical calculation devoid of all assumptions and estimates is not distinctly different than the preparation of estimates for . . . [p]resent . . . and [p]rospective [n]eed[,] [which] are likewise predicated upon estimates [and] . . . would . . . be no more impaired.

As a result, Mr. Reading recommended the court should sanction a completely new and different methodology than that used during

the first two rounds or in the FHA, one that "should be calculated as [a] separate and discrete component of affordable housing need utilizing data and procedures appropriate to a prior, rather than future period."  In other words, he recommended a methodology that retrospectively calculated gap-period housing need, rather than, as he stated in his December 29, 2015 report, the unmet gap-period housing needs being included in "the new calculation of present need."

The next day, on February 18, 2016, the court adopted Mr. Reading's new recommendation and issued its opinion.  As to the gap period, the court stated:

> The court finds municipalities are <u>constitutionally mandated</u> to address [the gap-period] obligation.  This "<u>gap period</u>" need <u>is</u> to be calculated as a <u>separate and discrete component</u> of a municipality's fair share obligation.  <u>This component</u>[,] <u>together with</u> a municipality's <u>unmet prior round obligations [from] 1987 to 1999</u>[,] <u>and</u> its <u>present need</u> <u>and</u> <u>prospective need</u>[,] shall comprise its "fair share" affordable housing obligation for the third [round] housing cycle.
>
> . . . .
>
> [I]t is ironic that both parties (or interests) appearing in [a] 2004 Appellate Division case are now advancing arguments before this court [that] they vehemently opposed in [<u>In re Six Month</u>].
>
> . . . .

> Even if the municipalities were [therefore] not [now] estopped from advancing their position[,] and despite their efforts here to distinguish . . . [*In re Six Month*] . . . the court finds the underlying principles in [*In re Six Month*] . . . are the same as the matter here.

[(Emphasis added).]

## III.

On appeal, the entities urging us to reverse the order argue that the judge erroneously imposed a new "separate and discrete" component of a municipality's fair share affordable housing obligation during the gap period. They contend the judge erred by: (1) failing to apply the plain language of the FHA; (2) ignoring the guidelines and principles established by In re N.J.A.C. 5:96 II; (3) applying the doctrine of judicial estoppel; and (4) acting as a replacement agency for COAH by resolving unresolved policy details of replacement Third Round Rules.

They assert that a municipality's fair share affordable housing obligation for the third-round cycle is comprised of: (1) the unmet prior round (before 1999) obligations; (2) present need; and (3) prospective need. They maintain, as Mr. Reading expressed in his December 29, 2015 report, that gap-period affordable housing needs would be captured in a town's calculation of its present need. They emphasize that imposing a retrospective gap-period obligation does not allow for a

realistic opportunity that the lower income housing will actually be constructed.

The entities urging us to affirm the order under review argue primarily that: (1) a municipality's prior round unfulfilled affordable housing obligations includes the gap period; (2) the FHA, as determined by COAH, provides for cumulative and uninterrupted calculations of prospective need; (3) COAH's interpretation of the FHA providing for gapless affordable housing need is reasonable; and (4) the judge's ruling complies with the FHA and In re N.J.A.C. 5:96 II.

Our standard of review is well settled. The sole question on appeal, whether a retrospective gap-period obligation is authorized by the core principles of the Mount Laurel doctrine, as codified in the FHA, and In re N.J.A.C. 5:96 II, is a legal issue not entitled to any special deference. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

IV.

Applying the plain language of the FHA, the guidelines and principles established by In re N.J.A.C. 5:96 II, and respecting the separation of powers doctrine,[11] we conclude that the judge

---

[11] The framers of the New Jersey Constitution articulated the separation of powers doctrine expressing that

(continued)

erroneously imposed a requirement that a municipality undertake a new, "separate and discrete" gap-period calculation — in addition to unmet prior round obligations, present, and prospective needs — to establish a municipality's fair share affordable housing obligation. We also reject the contention that judicial estoppel precludes reversal of the February 18, 2016 order under review.

## A.

We start with the plain language of the FHA. Our paramount goal in interpreting a statute is to ascertain the Legislature's intent, and "generally[] the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citation omitted). When interpreting a statute, we give words "their ordinary meaning and significance." Tumpson v. Farina, 218 N.J. 450, 467 (2014) (quoting DiProspero, supra, 183 N.J. at 492). Only when the statutory language is ambiguous and yields more than one plausible interpretation do we turn to

_____

(continued)

> [t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
>
> [N.J. Const., art. III, ¶ 1.]

extrinsic sources, such as legislative history. DiProspero, supra, 183 N.J. at 492-93. Here, there is no ambiguity.

The plain language of the FHA refers to present and prospective need. Responding to the significantly high fair share obligations in the aftermath of AMG Realty, the Legislature enacted the FHA, finding that one of the "essential ingredients" to its response was "the establishment of reasonable fair share housing guidelines and standards." N.J.S.A. 52:27D-302(d). Consequently, the Legislature focused on present and prospective need, N.J.S.A. 52:27D-307(b), and charged COAH to adopt guidelines for "[m]unicipal determination of its present and prospective fair share of the housing need in a given region which shall be computed for a 10-year period," N.J.S.A. 52:27D-307(c)(1) (emphasis added).

The FHA defines prospective need not by looking backwards, but rather as a "projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality." N.J.S.A. 52:27D-304(j) (emphasis added). In determining prospective need, COAH considered such things as municipalities' "approvals of development applications, real property transfers and economic projections prepared by the State Planning Commission." In re N.J.A.C. 5:96 I, supra, 215 N.J. at 591 (quoting N.J.A.C. 5:92-1.3).

The FHA did not define present need, but in the valid First Round Rules, COAH defined present need as "the total number of deficient housing units occupied by low[-] or moderate[-income] households." Id. at 590 (quoting N.J.A.C. 5:92-1.3). COAH used several factors to establish present need, such as "overcrowding, age of unit, and lack of plumbing, kitchen or heating facilities as indicators of dilapidated housing." Id. at 590-91.

The judge noted that COAH, in each of its three unsuccessful attempts to promulgate Third Round Rules, referenced the gap period, albeit with different unapproved methodologies. Although the judge acknowledged COAH's reference to the gap period during its three iterations of the un-adopted Third Round Rules, we note that an agency is not at liberty to impose additional requirements onto a statute that do not exist on its face. See In re N.J.A.C. 5:96 I, supra, 215 N.J. at 614-15 (invalidating the growth share methodology in the Third Round Rules and explaining that COAH may not enact regulations plainly at odds with the FHA); see also Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008) (explaining "an administrative agency's interpretation will not be followed when the agency extends a statute 'to give it a greater effect than its language permits'" (quoting GE Solid State v. Dir., Div. of

<u>Taxation</u>, 132 <u>N.J.</u> 298, 306 (1993))); <u>Fedders Fin. Corp. v. Dir., Div. of Taxation</u>, 96 <u>N.J.</u> 376, 392 (1984) (stating "[i]t is well established that [an agency's] regulatory authority cannot go beyond the Legislature's intent as expressed in the statute"); <u>Serv. Armament Co. v. Hyland</u>, 70 <u>N.J.</u> 550, 563 (1976) (explaining "an administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment").  To the extent COAH interpreted the FHA to include a requirement beyond present and prospective need and fulfilling prior round obligations, we conclude such an interpretation is "at odds with the plain meaning of the [FHA]." <u>Oberhand</u>, <u>supra</u>, 193 <u>N.J.</u> at 568.  The same proscription applies to the courts.

Importantly, during the sixteen-year gap period, the Legislature amended the FHA twelve times.  It did not amend the FHA, however, to require a retrospective determination of gap-period obligations.  Failure to so amend the FHA does not amount to Legislative authorization to retroactively adopt a new methodology for calculating affordable housing gap-period needs, even if COAH's un-adopted Third Round Rules sought to encapsulate the gap period.  <u>See</u> <u>GE Solid State</u>, <u>supra</u>, 132 <u>N.J.</u> at 312-13 (rejecting that the Legislature's failure to interfere with an administrative interpretation is proof that the agency's

34

interpretation conforms with legislative intent or establishes legislative acquiescence); see also Airwork Serv. Div., Div. of Pac. Airmotive Corp. v. Dir., Div. of Taxation, 97 N.J. 290, 296 (1984) (explaining that administrative acquiescence is only relevant when "the Legislature's intent cannot otherwise be determined by a critical examination of the purposes, policies, and language of the enactment" (emphasis added)).

Fair Share, supported by Dr. Kinsey, interprets "prospective need" to mean that a town is required to look at affordable housing needs prospectively starting from 1999, in addition to a separate ten-year prospective need calculation from the present. In other words, Fair Share argues a town's "prospective need" would cover a period of twenty-seven years, from 1999 to ten years from now. We conclude such an interpretation is clearly at odds with the FHA's unambiguous definition of prospective need. As it is defined in the FHA, prospective need refers to a "projection" of growth in the future, namely a "projection of housing needs based on development and growth which is reasonably likely to occur in a region or a municipality." By its nature, it does not involve retrospectively including a gap-period calculation.

In sum, to impose a gap-period requirement would inevitably add a new requirement not previously recognized under the FHA.

The Supreme Court has cautioned courts not to become a replacement agency for COAH in promulgating substantive rules. Rather, based on COAH's inaction, courts must work within the provisions of the FHA and should employ the first and second round methodologies to determine a municipality's compliance with its Mount Laurel obligations. Until COAH adopts Third Round Rules, or until the Legislature acts, the courts may not act as a legislature by imposing new, substantive obligations not recognized under the FHA.

### B.

Next, the judge did not follow the guidelines established by the Court in In re N.J.A.C. 5:96 II. We will address the relief requested in In re N.J.A.C. 5:96 II, the Court's response, and then our application of the guidelines to the judge's ruling.

### (i)

In In re N.J.A.C. 5:96 II, Fair Share, the NJBA, the NJLM, and various towns expressed their respective positions as to the guidance they believed the Court should provide to the designated Mount Laurel judges. We briefly summarize these competing positions to emphasize the Court's unwillingness to decide "unresolved policy details of replacement Third Round Rules" or to become a "replacement agency for COAH" by

essentially endorsing a new methodology for separately and discretely calculating affordable housing needs during the gap period.

> [Fair Share] ask[ed] that the <u>second-round</u> <u>methodology</u>, with limited modifications, be directed for use in such [remand] proceedings and that newly authorized judicial actions proceed expeditiously and on a notice-and-opportunity-to-be-heard basis.
>
> . . . .
>
> . . . [NJBA] contend[ed] that the administrative <u>stalemate</u> ha[d] <u>permitted</u> <u>municipalities</u> to "<u>shelter themselves</u>" from suit under COAH's jurisdiction <u>without</u> <u>providing any additional affordable housing</u> <u>in years</u>. They urge[d] the Court to fashion relief that [would] require courts to examine what towns have done to date in attempting to satisfy their constitutional obligations.
>
> . . . .
>
> [Various towns] contend[ed] that trial courts would be tasked with determining whether a municipality's fair share allocation will be "<u>cumulative</u>" or applicable only to one compliance period. The[y] also contend[ed] that adjudicating such <u>Mount Laurel</u> matters would require courts to confront the myriad <u>differences</u> <u>between the methodologies utilized in the</u> <u>prior rounds and those contained in the</u> <u>various iterations of COAH's Third Round</u> <u>Rules</u>.
>
> . . . .
>
> [NJLM] argue[d] that the 314 municipalities [which had submitted to

COAH's substantive certification under the earlier Third Round Rules] should not forfeit their protection from suit. According to NJLM, exclusionary zoning litigation would punish the municipalities, which [were] not responsible for COAH's most recent failure to adopt compliant Third Round Rules.

Notably, NJLM propose[d] an alternate solution, arguing that COAH ha[d] expended significant resources in developing the most recent proposed regulations, which efforts should not be wasted. NJLM suggest[ed] that the Court appoint "a former high-ranking policy-making official" to recruit three "professional planners" to assist in reviewing COAH's proposed Third Round Rules, the 3000 public comments, and any responses prepared by COAH's staff. NJLM propose[d] that this Court authorize those planners to revise the proposed Third Round Rules for review by the Court-selected "policy-making official." If the policy maker is satisfied, NJLM further propose[d] that he or she would present the revised regulations to this Court for approval, and for entry of an order directing COAH to adopt the Third Round Rules in that form.

[In re N.J.A.C. 5:96 II, supra, 221 N.J. at 12-16 (emphasis added).]

The Court responded to Fair Share's plea for guidance and, in light of the various stages of municipal preparation that had existed "as a result of the long period of uncertainty attributable to COAH's failure to promulgate Third Round Rules," the Court devised a transitional process before allowing exclusionary zoning actions to proceed. Id. at 20. In articulating the transitional process, and by expressing the

concomitant "guidelines . . . gleaned from the past [that] can provide assistance to the designated Mount Laurel judges," id. at 29-30, the Supreme Court did not include a new methodology for calculating additional housing obligations during the gap period. In our view, consideration of imposing such a new policy — that essentially addresses "unresolved policy details of replacement Third Round Rules" — is best left to the other two branches, where important public policy considerations can be fairly, fully, and openly debated.

(ii)

We now address the actual guidelines and principles listed by the Court for use by designated Mount Laurel judges handling declaratory judgment applications on constitutional-compliance applications. In enumerating these guidelines, the Court reiterated it did not intend to punish the towns that were "in a position of unfortunate uncertainty due to COAH's failure to maintain the viability of the administrative remedy." Id. at 23. Instead, the Court explained:

> Our goal is to establish an avenue by which towns can demonstrate their constitutional compliance [i.e., present and prospective obligations] to the courts through submission of a housing plan and use of processes, where appropriate, that are similar to those which would have been available through COAH for the achievement of substantive certification. Those processes include conciliation, mediation,

39

and the use, when necessary, of special masters. The end result of the processes employed by the courts is to achieve adoption of a municipal housing element and implementing ordinances deemed to be presumptively valid if thereafter subjected to challenge by third parties.

[_Id._ at 23-24 (emphasis added).]

The Court then identified specific procedures, guidelines, and principles.

In _In re N.J.A.C. 5:96 II_, the Court reasserted that "previous methodologies employed in the First and Second Round Rules should be used to establish present and prospective statewide and regional affordable housing need." _Id._ at 30 (emphasis added). As a result, municipalities were required to demonstrate to the court computations of housing need and municipal obligations "based on those methodologies." _Ibid._ (emphasis added). The Court reminded the designated _Mount Laurel_ judges they had the same discretion that COAH enjoyed when "assessing a town's plan, if persuaded that the techniques proposed by a town will promote for that municipality and region the constitutional goal of creating the realistic opportunity for producing its fair share of the present and prospective need for low- and moderate-income housing." _Ibid._ (emphasis added).

Importantly, the Court did not eradicate the prior round obligations. _Ibid._ Instead, the Court stated "municipalities

are expected to fulfill those obligations. As such, prior unfulfilled housing obligations should be the starting point for a determination of a municipality's fair share responsibility." Ibid. In reaching this conclusion, the Court cited Judge Cuff's recognition that "municipalities are responsible for fulfilling their prior round obligation," In re N.J.A.C. 5:94, supra, 390 N.J. Super. at 28, and Judge Skillman's approval, as a starting point, for the imposition of "the same prior round obligations [COAH] had established as the second round obligations in 1993," In re N.J.A.C. 5:96, supra, 416 N.J. Super. at 498-500.

Fulfilling prior round obligations, as described by the Court and in our 2007 and 2010 remand opinions, is decidedly different than imposing a new, retrospective, "separate and discrete" methodology for establishing affordable housing obligations during the gap period. A court-imposed "separate and discrete" retrospective gap-period calculation, on top of a town's existing and present and prospective fair share affordable housing obligations, would amount to the Court acting as a replacement agency for COAH, and would contravene the Court's unwillingness to decide unresolved policy issues relating to replacement Third Round Rules.

In addition to this assistance, the Court identified other principles that Mount Laurel designated judges should follow,

such as: our prior treatment of reallocation of present need[12]; bonus credits; cost-burdened poor; and the reduction of fewer surrogate indicators.  In re N.J.A.C. 5:96 II, supra, 221 N.J. at 30-33.  The Court emphasized that the courts should "employ flexibility in assessing a town's compliance and should exercise caution to avoid sanctioning any expressly disapproved practices from COAH's invalidated Third Round Rules."  Id. at 33. Finally, the Court reiterated its "hope that an administrative remedy will again become an option for those proactive municipalities that wish to use such means to obtain a determination of their housing obligations and the manner in which those obligations can be satisfied."  Id. at 34 (emphasis added).

(iii)

Here, the judge's ruling respectfully did not comport with In re N.J.A.C. 5:96 II.  The Court repeated its instructions that "previous methodologies employed in the First and Second Round Rules should be used to establish present and prospective statewide and regional affordable housing need."  Id. at 30. Further, it stated that "[t]he parties should demonstrate to the

---

[12]  "The [S]econd [R]ound [R]ules define[d] reallocated present need as 'the share of excess deterioration in a region transferred to all communities of the region with the exception of Urban Aid Cities.'"  In re N.J.A.C. 5:96 II, supra, 221 N.J. at 30 n.4 (alterations in original) (citations omitted).

court computations of housing need and municipal obligations based on those methodologies." <u>Ibid.</u> The Court stated that the starting point for a determination of a municipality's fair share responsibility is the prior round unfulfilled obligations. <u>Ibid.</u> Requiring municipalities to undertake a retrospective "separate and discrete" additional calculation for affordable housing need does not follow the First or Second Round Rules. It mandates an entirely new obligation unauthorized by the FHA.

The judge concluded that "New Jersey's affordable housing need is cumulative and there can be no gaps in time left unaddressed." He based this conclusion on his interpretation of <u>Mount Laurel II</u>, stating the Court "found the obligation to meet the prospective lower income housing need of the region is, by definition, one that is met year after year in the future, throughout the years of the particular projection used in calculating prospective need." However, the Court's statement was aimed at the practical effects of establishing prospective need, stating:

> The <u>Mount Laurel</u> obligation to meet the <u>prospective</u> [looking forward not retrospectively] lower income housing need of the region is, by definition, one that is met year after year in the future, throughout the years of the particular projection used in <u>calculating prospective need</u>. In this sense the affirmative obligation to provide a <u>realistic opportunity</u> to construct a fair share of

lower income housing is met by a "phase-in" over those years; it need not be provided immediately. Nevertheless, there may be circumstances in which the obligation requires zoning that will provide an immediate opportunity -- for instance, zoning to meet the region's present lower income housing need. <u>In some cases</u>, the provision of such a <u>realistic opportunity might result in the immediate construction of lower income housing in such quantity as would radically transform the municipality overnight</u>. Trial courts shall have the discretion, under those circumstances, to moderate the impact of such housing by allowing even the <u>present need</u> to be phased in over a period of years. Such power, however, should be exercised sparingly. The same power may be exercised in the satisfaction of <u>prospective need</u>, equally sparingly, and with special care to assure that such further postponement will not significantly dilute the <u>Mount Laurel</u> obligation.

[<u>Mount Laurel II</u>, <u>supra</u>, 92 <u>N.J.</u> at 218-19 (emphasis added).]

The language quoted by the judge pertained to the Court's recognition that phasing in was an option for municipalities in calculating present and prospective need. Therefore, the judge's reliance on <u>Mount Laurel II</u> for the proposition that there can be no gap periods is respectfully misplaced. Furthermore, the FHA, enacted after <u>Mount Laurel II</u>, and the Court's opinion in <u>In re N.J.A.C. 5:96 II</u> do not support such a conclusion.

C.

Whether to establish a new methodology that imposes retrospective calculations for determining affordable housing needs during the gap period, which would be in addition to satisfying prior round unmet present and prospective obligations, is best left for consideration by the Legislative and Executive branches. As the Court explained in 2013, when it invalidated COAH's Third Round Rules:

> The Legislature may determine to authorize new avenues for addressing regional need and the promotion of affordable housing. And, it may do so in ways that we do not attempt to circumscribe in this opinion because we do not know the breadth of considerations that may be brought forth through informational legislative hearings on the subject. Nevertheless, it is the Legislature that must devise the parameters to such an approach. It must craft new legislation if that is the course it wishes to take. Our courts can and should exercise caution and defer to such solutions when appropriately drafted by the Legislature. See N.J. Ass'n on [Corr.] v. Lan, 80 N.J. 199, 220 (1979) (acknowledging importance of deference to legislative enactments addressing general welfare (citation omitted)); Roe v. Kervick, 42 N.J. 191, 230 (1964) (recognizing value of deference when reasonable minds could differ and issue to be remedied "involves a concept which varies with the needs of the times").
>
> Although the Legislature may consider enacting an alternative form of remedy for the promotion of affordable housing in the housing regions of this state, see Hills

45

> [Dev. Co. v. Twp. of Bernards, 103 N.J. 1,] 65 [(1986)] ("No one should assume that our exercise of comity today signals a weakening of our resolve to enforce the constitutional rights of New Jersey's lower income citizens. The constitutional obligation has not changed; the judiciary's ultimate duty to enforce it has not changed; our determination to perform that duty has not changed."), enforcement of the constitutional obligation is still a matter that may be brought to the courts.
>
> [In re N.J.A.C. 5:96 I, supra, 215 N.J. at 616-17.]

Deferring to the Legislature on such policy considerations is especially important here because COAH is a "legislatively created, unique device for securing satisfaction of Mount Laurel obligations."  In re N.J.A.C. 5:96 II, supra, 221 N.J. at 29. As the Court stated, it is not our role to become a replacement agency for COAH by creating "an alternate form of statewide administrative decision maker for unresolved policy details of replacement Third Round Rules."  Ibid.  We discern no constitutional basis for the judiciary, much less this court, to intrude into the policy-making arena, an area traditionally reserved in our tripartite system of governance to the legislative[13] and executive branches.

---

[13]   Although not dispositive on the legal question presented on appeal, there are two identical pending bills in the Assembly and Senate directly on point.  The Legislative statement accompanying those bills states in pertinent part:

(continued)

We reject the contention that the doctrine of judicial estoppel bars the challenge to the court's holding as to the gap-period issue. We review a trial court's decision to invoke judicial estoppel using an abuse of discretion standard. State, Div. of Motor Vehicles v. Caruso, 291 N.J. Super. 430, 438 (App. Div. 1996).

The law as to the doctrine of judicial estoppel is well settled. To protect the integrity of the court system, "[w]hen

---

(continued)

> Although the [FHA] clearly states that the State Constitution's affordable housing obligation is comprised of "present and prospective need" for affordable housing only, some courts have misunderstood the intent of the Legislature behind the [FHA], and imposed a retroactive obligation for the so-called gap period. The purpose of this bill is to eliminate any possible misconception with respect to the Legislature's intent to ensure that determination of a municipality's fair share of affordable housing will be based upon the present and prospective need for affordable housing, as clearly set forth in the [FHA], and that a fair share obligation will not include a retrospective need that may have arisen during any "gap period" between housing cycles.
>
> [Statement to Assemb. No. 3821, and Statement to S.B. No. 2254 at 7 (May 23, 2016) (emphasis added).]

a party successfully asserts a position in a prior legal proceeding, that party cannot assert a contrary position in subsequent litigation arising out of the same events." Kress v. La Villa, 335 N.J. Super. 400, 412 (App. Div. 2000) (emphasis added), certif. denied, 168 N.J. 289 (2001). It has been summarized as follows: "The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." Kimball Int'l, Inc. v Northfield Metal Prods., 334 N.J. Super. 596, 607 (App. Div. 2000) (citation omitted), certif. denied, 167 N.J. 88 (2001).

Judicial estoppel is not a favored remedy because of its draconian consequences. It is to be invoked only in limited circumstances:

> It is . . . generally recognized that judicial estoppel is an "extraordinary remedy," which should be invoked only "when a party's inconsistent behavior will otherwise result in a miscarriage of justice." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996) (quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 424 (3d Cir.) (Stapleton, J., dissenting), cert. denied, 488 U.S. 967, 109 S. Ct. 495, 102 L. Ed. 2d 532 (1988)); see also [Teledyne Indus., Inc., v. NLRB, 911 F.2d 1214,] 1218 [(6th Cir. 1990)] ("Judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the

truth of either statement."). Thus, as with other claim and issue preclusion doctrines, judicial estoppel should be invoked only in those circumstances required to serve its stated purpose, which is to protect the integrity of the judicial process.

[Id. at 608 (footnote omitted).]

In Ali v. Rutgers, 166 N.J. 280, 288 (2000), our Supreme Court confirmed that judicial estoppel is an "extraordinary remedy." The facts presented on this appeal do not warrant application of this remedy.

In invoking the doctrine of judicial estoppel and imposing a "separate and discrete" gap-period obligation, the judge relied on our opinion in In re Six Month. We conclude that the court's reliance is misplaced. We reach that conclusion primarily because the parties and issues in In re Six Month were substantially different than here, and since issuing our opinion in In re Six Month, the Court provided Mount Laurel judges with further guidelines and principles in In re N.J.A.C. 5:96 II.

As to the dissimilarity of issues, our focus in In re Six Month was on COAH's interim procedural rules designed to address a six-year period between 1999 and 2004. Supra, 372 N.J. Super. at 68. In In re Six Month, we identified the sole issue:

These [seven] appeals concern only N.J.A.C. 5:91-14.3, which provides a mechanism for municipalities previously certified in the second round to receive an extension of their substantive certification status and,

> therefore, further protection from civil action remedies, for up to one year following the adoption of the third-round rules, well beyond the previously scheduled 1999 expiration of second-round standards and methodology.
>
> [Ibid.]

Here, the issue is whether a retrospective "separate and discrete" gap-period obligation is authorized by (1) the core principles of the Mount Laurel doctrine, as codified in the FHA; and (2) In re N.J.A.C. 5:96 II. There, we were not asked to address, and we did not sanction, a gap-period affordable housing obligation, on top of prior unfulfilled obligations and present and prospective needs. Rather, we temporarily suspended substantive certifications granted by COAH pursuant to N.J.A.C. 5:91-14.3, subject to rule modifications. Id. at 105. As to the dissimilarity of parties, none of the Ocean County municipality entities participated in In re Six Month.

V.

In sum, we conclude that the core principles of the Mount Laurel doctrine, as codified in the FHA, and the guidelines and principles established by the New Jersey Supreme Court in In re N.J.A.C. 5:96 II, do not authorize a retrospective new "separate and discrete" affordable housing gap-period obligation. Following In re N.J.A.C. 5:96 II, a town should start with its unfulfilled prior round obligations and then establish its

present and prospective need in establishing a municipality's fair share Mount Laurel obligation.

Finally, we emphasize that our holding today does not ignore housing needs that arose in the gap period or a municipality's obligation to otherwise satisfy its constitutional fair share obligations. As Mr. Reading candidly acknowledged, "[low- and moderate-income] households formed during the gap period may no longer represent an affordable housing need due to a variety of reasons including death, changes in income, increase or decrease in household size, retirement and/or relocation outside of New Jersey." However, he also stated that housing need from the gap period would be "partially included" by those living in "over[]crowded or deficient housing units that are encompassed in the new calculation of [p]resent [n]eed." Therefore, the scope of present need should be dictated by identifiable housing need characteristics as found by the reviewing Mount Laurel judge when examining the evidence presented.[14] In this context, the focus remains — as it has for the last forty years - on the constitutional obligation of realistically affording

_____

[14]    The Municipal Group asserted in its amicus brief that "municipalities presented facts to show that developers constructed roughly 90,000 rental units affordable to low[-] or moderate-income households during the gap period."

opportunities for construction of a municipality's fair share of present and prospective need for low- and moderate-income housing.

We reach our conclusion emphasizing: (1) the core of the Mount Laurel doctrine is a municipality "would satisfy [its] constitutional obligation by affirmatively affording a realistic opportunity for the construction of its fair share of the present and prospective regional need for low[-] and moderate[-income] income housing," Mount Laurel II, supra, 92 N.J. at 205 (emphasis added); (2) a realistic opportunity depends on "whether there is in fact a likelihood -- to the extent economic conditions allow -- that the lower income housing will actually be constructed," id. at 222; (3) the FHA codified the core constitutional holding undergirding the Mount Laurel obligation, In re N.J.A.C. 5:96 I, supra, 215 N.J. at 584, and specifically defined "prospective need" as a forward projection of housing needs "based on development and growth . . . [which is] reasonably likely to occur in a region or a municipality," N.J.A.C. 5:92-1.3; (4) the FHA charged COAH with determining "State and regional present and prospective need for low[-] and moderate[-income] housing," In re N.J.A.C. 5:96 I, supra, 215 N.J. at 589 (emphasis added); (5) although the Legislature amended the FHA twelve times during the gap period, it did not

impose a retrospective "separate and discrete" gap-period obligation; (6) although the Appellate Division and the Supreme Court likewise had opportunities during the gap period to require a "separate and discrete" gap-period obligation, such an obligation was not imposed, and instead remained steadfast to the FHA's focus on State and regional <u>present and prospective</u> need for low- and moderate-income housing; (7) identified low- and moderate-income households formed during the gap period in need of affordable housing can be captured in a municipality's calculation of present need; and (8) under our tripartite system of jurisprudence, imposing a "separate and discrete" gap-period obligation is best left for consideration by the Legislative and Executive branches of government where the issues can be fairly and fully debated in the public forum.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION